UNITED STATES of America
v.
Ralph D. ROCKS.
Crim. No. 230–71–N.

United States District Court,
E. D. Virginia.

March 9, 1972.

Brian P. Gettings, U. S. Atty., Norfolk, Va., and Russell T. Baker, Jr., Sp. Asst. U. S. Atty., Baltimore, Md., for the United States.

Arnold M. Weiner and Ronald S. Liebman, Baltimore, Md., and L. S. Parsons, Jr., Norfolk, Va., for defendant.

HARVEY, District Judge.

After a trial that lasted more than three weeks, Ralph D. Rocks, defendant herein, was found guilty by a jury of a violation of 18 U.S.C. § 1952. Rocks and a co-defendant, Jesse S. Baggett, had been jointly indicted in the United States District Court for the District of Maryland and charged with the offense in question. Criminal No. 28958. A severance was thereafter granted, and Bag-

gett was tried first in Baltimore. On October 27, 1971, the Maryland jury found Baggett guilty as charged. Because of extensive publicity attending the Baggett trial, Rocks moved for a change of venue, and his case was removed to the Eastern District of Virginia for trial in Norfolk. The Rocks trial commenced on January 3, 1972 and was concluded by a guilty verdict returned by the jury on January 26, 1972.

Rocks has now filed a motion for a new trial based on various grounds. *Inter alia*, Rocks claims that the jury which convicted him was influenced by a newspaper article that appeared in the Norfolk *Ledger Star* on January 25, 1972.[1] He alleges that there were highly prejudicial facts contained in such article, that members of the jury read the article and that when such members of the jury considered the facts contained therein, his constitutional right to be confronted with the witnesses against him under the Sixth Amendment was infringed. In support of this portion of his motion for a new trial, the principal defense attorney filed an affidavit indicating that he had interviewed the foreman of the jury some ten days after the trial was concluded and that in response to such attorney's questions, certain statements had been made by the foreman mentioning the newspaper article in question.

After reviewing the motion and affidavit and conferring with counsel, the Court ordered a post-trial hearing to be held in Norfolk in connection with the questions raised. Briefs were filed, and after the testimony of all 12 jurors was heard in open court, counsel fully argued this aspect of the pending motion.

At conferences before the Rocks trial commenced, the Court had discussed with counsel whether or not the Virginia jury should be advised that the co-defendant Baggett had previously been tried. It was apparent that the fact of such a trial would come to the jury's attention when many of the witnesses who had testified at Baggett's trial were cross-examined at Rocks' trial with reference to their prior testimony. Accordingly, over objection by the defendant Rocks, the Court ruled that it would advise the Virginia jury of the fact of the earlier trial but would not advise such jury of its outcome.

On January 3, 1972, in addressing the entire venire to determine if any prospective juror had read or otherwise learned about the previous trial, the Court said the following:

"There has been a previous trial in this case involving the defendant Baggett. You, the members of the jury, are not to be concerned in any way with the outcome of that previous trial. Whether the defendant Baggett was acquitted, whether he was convicted or whether the trial was terminated in some other way should have no bearing whatsoever on your determination of the guilt or innocence of the defendant Rocks at this trial. You should decide the issues in this case solely on the evidence that is presented in this court room, the testimony of the witnesses and the exhibits that are put in evidence. So for this reason I am not going to tell you the outcome of the previous trial and you should not guess or speculate as to the outcome of that trial. That case has no bearing whatsoever on this one. Now let me ask you this, is there any one who has read about the previous trial? Again, I don't want you to tell us what you may have read or heard on the radio or seen on the television. I'll expand the question to include radio and television. Anybody who may have seen anything in the press or heard anything on the radio or television about the previous trial?"[2]

After the jury had been empanelled, further instructions were given by the

---

1. It has been agreed that consideration of the other grounds advanced by defendant in support of his motion will be deferred until after a decision herein.

2. The reporter's notes indicate that there was no response to this inquiry.

Court that same day to the twelve jurors and four alternates who were to hear the case, as follows (Tr. 6–7):

"Now, it is very important that you not read anything in the newspapers about this case. Furthermore, it is very important that you not look at any newspapers of yesterday or the day before or in the last week or so, that may have had something about this case in it.

"Furthermore, if there should be anything on the radio that you hear, in which this case is mentioned, please turn it off; don't listen to it, don't look at anything on television having to do with this case.

"It is extremely important that the only evidence which you should consider, the only information about the case which you should consider is that which you will hear right in this courtroom, either from witnesses, or by way of exhibits that are put in evidence.

"If anyone should talk to you about this case, please don't discuss it, don't discuss it even with your spouses or members of your family; and if anyone from the outside comes up and tries to talk to you about the case, please report it to me; because what you will decide this case on will be what you hear right in the courtroom and not what you may hear from someone on the outside."

These instructions were repeated regularly throughout the trial. (Tr. 389, 646, 1096, 1788, 2310). In the Court's final charge to the jury, which was delivered on January 25, 1972, the following was said (Tr. 3407, 3426):

"You will note that the indictment charges both the defendant Jesse S. Baggett and the defendant Ralph D. Rocks with committing the crime in question. For reasons that are of no concern to you, only the defendant Rocks has been tried in this case. The defendant Baggett was tried at an earlier date. As I have previously told you, you are not to be concerned in any way with the outcome of that previous trial. You have not been advised of the outcome of the Baggett trial because it has no bearing whatsoever on your determination of the guilt or innocence of the defendant Rocks in this trial. You are not to guess or speculate as to the outcome of the Baggett trial, and you are not to attach any significance to the fact that the defendant Baggett has previously been tried in Maryland and that the defendant Rocks has now been tried here in Virginia.

\* \* \* \* \* \*

"Now, during the trial of this case I have repeatedly instructed you not to read, listen to or observe any news stories concerning this case in newspapers, on radio or on television. In the event that any publicity in the news media may have come to your attention inadvertently or otherwise, I now instruct you to completely disregard any facts thereby brought to your attention. Your verdict may not be based upon anything which you may have heard outside the court room. The only evidence which you may consider in reaching your verdict is the evidence produced by way of witnesses who testified during the trial or by way of exhibits admitted in evidence."

The jury retired to commence its deliberations on January 25, 1972, at 11:20 A.M. At 4:55 P.M., the jury sent a note to the Court requesting permission to go home that evening and return to continue their consideration of the case the next morning. With the approval of counsel, the jury was permitted to disband for the evening and was instructed to return to resume its deliberations the next morning at 9:30 A.M. The following additional instruction was given to the jury before it was excused that evening (Tr. 3455):

"Now, it is particularly important tonight that you not consult with anyone, not with each other. Don't call another juror and discuss anything to do with this case or the deliberations.

Don't discuss it with anyone at home and I would suggest that tonight and tomorrow morning you not read any newspapers at all and try not to listen to the radio or view anything on television, if there should be anything in the press relating to this case.

"If anyone approaches you and tries to discuss the case with you in any way between now and tomorrow morning when we will resume, you should bring it to my attention tomorrow morning.

"At this stage, with deliberations underway, it is very, very important that you not discuss the case with anyone at all.

"So the jury will be excused and we'll keep the exhibits in the jury room and lock the jury room if we can. You will be excused and we will return here in the courtroom tomorrow morning at 9:30."

That same afternoon, January 25, 1972, the following article had been printed in the *Ledger Star*, a Norfolk newspaper of general circulation:

## "JURY OUT IN TRIAL FOR ZONING BRIBERY

"NORFOLK—A U. S. District Court jury here began deliberations about 11 a. m. today in the trial of a Washington area developer charged with bribing a former Prince Georges County, Md., commissioner for favorable consideration of a zoning application.

"Ralph D. Rocks, 54, president of Rocks Engineering Co., was named in a federal indictment in December, 1969, charging him with bribing former Commissioner Jesse S. Baggett seven years ago with a $3,500 tractor.

"The trial opened here Jan. 2 with testimony from the government that Rocks' Washington D. C.-based firm sent a check dated Dec. 23, 1964, to Maryland for $3,500 with intent to bribe Baggett, 62.

"U. S. District Court Judge Alexander Harvey II of Maryland has been hearing the case for the past three weeks here.

"The trial was transferred to the Norfolk district court after Rocks' attorneys, Ronald S. Liebman and Arnold M. Weiner, argued successfully that the 'flood' of publicity growing out of the Baggett trial in October, made the selection of an unbiased jury improbable.

"Baggett, also charged in a similar indictment, was convicted following his 15 days of trial in Maryland of accepting a bribe. Sentencing in his case has been delayed pending the outcome of Rocks' case.

"Baggett could receive up to five years in prison and a $10,000 fine as punishment.

"The indictment naming both men was one of four which grew out of a three-year federal investigation into allegations of rezoning irregularities in the Maryland suburbs of Washington in the early and mid-1960's.

"Baggett was a commissioner during the years of Prince Georges' most rapid growth.

"Rocks' enterprises included developments in Montgomery County, Washington, Virginia and Florida.

"The developer was acquitted last year along with another man, Rogers H. Israel, former president of Loyola Federal Savings & Loan Association of Baltimore, with federal fraud and conspiracy involving $2.6 million in construction loan funds."

The next morning, January 26, 1972, the members of the jury reconvened, resuming their deliberations at about 9:30 A.M. At 10:20 A.M., the jury returned with a verdict of guilty on the one count indictment.

Defendant contends that one or more of the jurors read the newspaper article in question and that his constitutional right to be confronted with the witnesses against him was thereby infringed.

in the motion and in the affidavit submitted by defense counsel, an evidentiary hearing was held on February 23, 1972. The twelve jurors who rendered the verdict were subpoenaed, and each of the jurors testified in open court under oath. Examination of the jurors was conducted by the Court itself. The Court had previously conferred with counsel concerning the scope of the inquiry, and counsel had been given an opportunity to submit in advance appropriate questions. Defense counsel had further requested the right to cross-examine each juror witness. This request was denied, but the Court permitted counsel on both sides to suggest further questions after the Court's questioning was completed and many of these questions were in fact asked by the Court. After all twelve jurors had been examined by the Court, eight of them were recalled for further questioning suggested by the testimony that had then been received.

 With limited exceptions, it is a settled rule that a juror's testimony is not receivable to impeach his own verdict. Young v. United States, 163 F.2d 187, 188 (10th Cir. 1947), cert. den. 332 U.S. 770, 68 S.Ct. 83, 92 L.Ed. 355 (1947); Rakes v. United States, 169 F. 2d 739, 745 (4th Cir. 1948), cert. den. 335 U.S. 826, 69 S.Ct. 51, 93 L.Ed. 380 (1948); United States v. Rees, 193 F. Supp. 861 (D.Md.1961). The inviolability of the jury room from outside influence of any sort is a prime necessity in the administration of justice. Rakes v. United States, *supra*, 169 F.2d at 745. As the Supreme Court said in McDonald v. Pless, 238 U.S. 264, 267, 35 S.Ct. 783, 784, 59 L.Ed. 1300 (1915), if there were not strict limits to inquiries into jury verdicts after they had been returned, then jurors "would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict." Litiga-Wright & Miller, Federal Practice and Procedure, § 554, p. 493, 494.[3] A new

tion must be terminated at some reasonable point and if jurors could, without limitation, be examined concerning their deliberations and their verdict, the result would be to make what was intended to be a private deliberation into a constant subject of public investigation impeding frankness and freedom of discussion in the jury room. *Idem*, at 268, 35 S.Ct. at 784; Annotation, 58 A.L.R.2d 556, 559 (1958).

In United States v. Crosby, 294 F.2d 928, 950 (2d Cir. 1961), cert. den. Mittleman v. United States, 368 U.S. 984, 82 S.Ct. 599, 7 L.Ed.2d 523 (1962), the Court listed the dangers inherent in a post-verdict inquiry into jury verdicts as follows (at 950):

"There are many cogent reasons militating against post-verdict inquiry into jurors' motives for decision. The jurors themselves ought not be subjected to harassment; the courts ought not be burdened with large numbers of applications mostly without real merit; the chances and temptations for tampering ought not be increased; verdicts ought not be made so uncertain."

 An exception to the general rule limiting post-verdict examination of jurors is recognized when it appears that matters not in evidence may have come to the attention of one or more jurors so as to violate the defendant's constitutional right to be confronted with the witnesses against him. Parker v. Gladden, 385 U.S. 363, 87 S.Ct. 468, 17 L.Ed. 2d 420 (1966). Thus, a juror may testify to facts bearing upon the question of the existence of any such extraneous influence, but not as to how far that influence operated upon his mind. Mattox v. United States, 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917 (1892); Remmer v. United States, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954); Holmes v. United States, 284 F.2d 716 (4th Cir. 1960); Downey v. Peyton, 451 F.2d 236 (4th Cir. 1971); United States v. Rees, *supra*; In order to inquire into the facts alleged

3. See also American Bar Association Minimum Standards Relating to Trial by Jury, § 5.7 (c) (i).

trial is mandatory if it appears in a criminal case that individual jurors have read newspaper articles containing incompetent and prejudicial information. Holmes v. United States, *supra*. However, the manner in which a Court should determine whether a jury has been subjected to outside influence should be left to the discretion of the trial judge. Marshall v. United States, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959). As the Supreme Court said in that case (at page 312, 79 S.Ct. at page 1173):

> "The trial judge has a large discretion in ruling on the issue of prejudice resulting from the reading by jurors of news articles concerning the trial. Holt v. United States, 218 U.S. 245, 251, [31 S.Ct. 2, 6, 54 L.Ed. 1021]. Generalizations beyond that statement are not profitable, because each case must turn on its special facts."

Pursuant to the authorities cited hereinabove, this Court ordered that a post-trial evidentiary hearing be held. However, the inquiry was strictly limited to the alleged outside influence, namely, whether the newspaper article in question or the statements made therein had come to the attention of any member of the jury between 5:00 P.M. on January 25 and 10:20 A.M. on January 26 when the verdict was returned. To prevent impermissible questioning of the jurors beyond this limited scope of the hearing, the Court itself examined each juror.

After consideration of the testimony at the hearing, this Court finds that, before the verdict was rendered, none of the jurors read the contents of the article that appeared in the *Ledger Star* on

January 25, 1972. This Court further finds that the matters referred to in such article were not discussed in the jury room on the morning of January 26, nor did they otherwise then come to the attention of the jury. Only one juror noticed the article in the newspaper that evening. Juror Bowers testified that he read the headline of the article but, because of the Court's instructions, did not read the article itself.[4] Juror Early testified that he heard some one in the jury room ask if any one had seen anything in the newspapers. He did not remember who made this inquiry, but he did recall that the response was "No, they hadn't saw anything." Juror Neese testified that on the morning of January 26 she heard one or more other jurors mention in the jury room the fact that an article had appeared in the paper. She did not remember who was involved. She did not hear any discussion of the facts mentioned in the article, and she characterized what she heard as "muddled conversation."[5]

■ Except for the testimony of Jurors Bowers, Early and Neese as mentioned hereinabove, each of the 12 members of the jury in turn testified under oath that he or she did not see the article in question, that no one else either in the jury room or outside brought the article or the matters therein to his or her attention, and that he or she did not hear any of the other jurors discussing on the last morning of the trial the article or any of the facts mentioned therein.[6] Considering the testimony in its entirety, this Court concludes that the matters set forth in the newspaper article in question did not before the verdict was rendered come to the attention

---

4. Juror Bowers remembered the headline as saying that "the Rocks case was presented to the jury." He apparently received an earlier edition of the newspaper than that put in evidence. After reading the headline, he passed the newspaper to his wife and read the article itself after the case was over.

5. It is likely that what Juror Neese heard was the inquiry that Juror Early heard, namely, whether any one had seen any-

thing in the newspapers. No other juror remembered hearing any comment in the form that Juror Neese believed she heard it.

6. Each juror witness was given the newspaper article to read while on the stand and was asked specifically whether he or she had heard any discussion in the jury room that final morning of the facts mentioned therein. All 12 jurors testified that they heard no such discussion.

of one or more jurors in such a way as to deny defendant's constitutional right to be confronted with the witnesses against him.[7] See United States v. Gibas, 300 F.2d 836, 840 (7th Cir. 1962), cert. den. 371 U.S. 817, 83 S.Ct. 32, 9 L.Ed.2d 58 (1962).

■ In support of his motion, defendant advances two principal arguments. First, defendant claims that he was denied his right of cross-examination when the Court undertook to question the jurors itself. But, when a post-verdict evidentiary hearing is held, a convicted defendant does not have an unlimited right to cross-examine juror witnesses. Miller v. United States, 403 F.2d 77, 81–84 (2d Cir. 1968). As Judge Friendly said, speaking for the Court in that case, at page 82:

> "Especially because the line between proper and improper inquiry is not easy to draw, * * * and because the jurors may be in doubt about the proprieties, the judge may well find it better that he control any questioning, whether by having it done in open court, as the Supreme Court directed in Remmer v. United States, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954), by allowing depositions where the prosecutor would have an opportunity to object to improper questions, or *by passing in advance on the questions sought to be propounded.*" (Emphasis added)

■ With reference to the post-verdict hearing held in this case, this Court did in fact pass in advance on the questions sought to be propounded to the juror witnesses and then interrogated the jurors itself. Counsel were permitted to suggest additional questions after the Court had completed its questioning of each juror witness.[8] A number of the jurors were recalled to the stand so that additional matters might be inquired

into by the Court. In this manner, the questioning of the juror witnesses was confined to the issue of the existence of the alleged extraneous influence and was not permitted to include any inquiry into the jurors' actual deliberations nor the reasons for their verdict. That defense counsel wished to inquire into impermissible subjects in questioning the juror witnesses quite clearly appears from the questions that he submitted in advance of the hearing. Defendant's attorney requested the Court to ask the jurors whether the fact that Baggett had been convicted in Baltimore had ever been discussed by any of the jurors during the jury deliberations. The Court refused to ask this question as well as several others which sought to inquire into the substance of deliberations occurring before the morning of January 26, 1972.

United States v. Guthrie, 387 F.2d 569 (4th Cir. 1967), is not to the contrary. There the question as to private communications between a government witness and a juror was raised for the first time during the pendency of the appeal. The issue had therefore been presented to the Fourth Circuit by means of the submission of ex parte affidavits. The Court, noting that the fact that an alleged conversation had taken place was not disputed, remanded the case so that the defendants might have a hearing and an opportunity to cross-examine. In *Guthrie*, the Court was not presented with any questions as to the extent that a juror might be interrogated by defense counsel after such juror had denied under oath the existence of any extraneous influence. At the post-verdict hearing in this case, defense counsel was not permitted to challenge or contradict testimony under oath by individual jurors that they had not read the newspaper article in question. To have permitted such challenge would have resulted in the type of harassment and "searching

---

7. The disparity between the actual facts and the allegations of the motion which impelled this Court to order a post-trial hearing suggests the desirability of a rule such as that mentioned in Miller v. United States, *infra* at 82, which would prohibit questioning of a juror by an attorney after a verdict except by leave of court.

8. Numerous bench conferences were held while juror witnesses were on the stand, and counsel's suggested additional questions were made a part of the record.

hostile inquiry" condemned in Rakes v. United States, *supra*, 169 F.2d at 745.

Secondly, defendant argues that the testimony adduced at the post-verdict hearing indicates that several jurors did in fact read and discuss the contents of the newspaper article in question. Defendant claims that it was the newspaper article which caused the jury to reach agreement so quickly on January 26. In the late afternoon of January 25, before the jury was sent home for the evening, the jury stood 9 to 3 for conviction. The next morning after some 30 to 40 minutes of further deliberation, another vote was taken and all 12 jurors voted for conviction. Defendant contends that the facts set forth in the newspaper article came to the attention of the 3 holdouts between 5 o'clock P.M. and the time that the final vote was taken the next morning and that such facts caused the minority to change their votes. Such contention amounts to no more than conjecture on the part of defense counsel. Like the other 9 jurors, the 3 holdouts all testified that they had not read the newspaper article and that none of the facts set forth in the article came to their attention either outside of the court room or during their deliberations on the final morning of the trial.

Defendant relies particularly on the testimony of Juror Neese and on the testimony of four other jurors who met and discussed the case in a restaurant across the street from the courthouse after the verdict had been returned and the jury discharged. Juror Neese, after testifying that she heard one or more of the jurors mention the fact that an article had appeared in the paper, said that she "would suppose" that the three holdouts were discussing the article when she

saw them talking to each other in the jury room on the final morning of the trial. When pressed by the Court, she admitted that she was some distance away, that she was not paying too much attention and that she actually could not hear what these three were talking about although she could say for sure that they were talking together. When considered in its entirety, the testimony of Juror Neese does not support defendant's claim that the facts set forth in the newspaper article came to the attention of and were considered by the three holdout jurors. Nor does any of the other testimony. Whatever may have caused these three to change their minds on the last morning of the trial, the evidence does not show that it was the newspaper article in question.

After the jury was discharged, seven of the twelve jurors went across the street to the Dutch Kitchen Restaurant for coffee.[9] Four of the seven remembered hearing something said at the restaurant concerning a newspaper article relating to the case. Apparently, no one of the jurors was paying much attention to the conversation in question because none of the four could remember who mentioned the newspaper article at that time and each gave a different version of what was said.[10] Juror Levine testified that she did not know "who said what" because she was giggling and laughing and fooling around with the waitress. Juror Bowers described the talk at the Dutch Kitchen as "a bunch of foolishness." After considering the testimony of the four who heard something mentioned about the article and comparing the testimony of each with the others, this Court accepts the version given by juror Stearns.[11] She testified that she heard someone say "I wonder

---

9. The 3 holdout jurors were not in this group.

10. There were others in the restaurant at the time the seven jurors met for coffee, including waitresses and other customers who joined in the banter. It is not entirely clear from the testimony whether the reference to the newspaper article was made by a juror or by some one else then in the Dutch Kitchen.

11. Jurors Stearns, Miller (the foreman), Levine and Bowers were the ones who remembered that something was said at the Dutch Kitchen about a newspaper article. The other three jurors who were there that morning did not recall any such discussion.

if they read it in the paper." Apparently several of the jurors were speculating as to the reason why the three holdouts changed their minds and voted for a conviction on the last morning of the deliberations. Juror Bowers knew that an article on the trial had appeared in the paper the night before. He could not remember at the time that he testified whether he had mentioned this to the others in the restaurant or not. It would appear that he probably did and that several jurors then engaged in speculation that the three holdouts had seen the article and had been influenced in some way by the newspaper article. Or general discussion may have begun when some one of those present remembered hearing what Juror Early heard, namely, one juror asking another whether he had seen anything in the newspapers.

Considered in its entirety, the testimony discloses that the discussion at the Dutch Kitchen after the jury had been discharged amounted to no more than pure conjecture by certain jurors as to the mental processes of other jurors. As this Court has found, the evidence establishes that the three jurors in question had not seen the article nor had the facts in the article been brought to their attention. Defendant would convert idle gossip and banter occurring after the conclusion of a long case into a finding that the jury was influenced by extraneous matters. A comparison of what actually transpired at the restaurant after the verdict had been returned with defendant's interpretation thereof emphasizes the soundness of the rule that a juror's testimony should not be receivable to impeach his verdict except as to very limited subjects and then only if carefully supervised by the Court.

For the reasons stated, defendant is not entitled to a new trial on the ground that his Sixth Amendment rights were infringed because of any extraneous influence on the jury. No Order will be entered at this time, pending a further hearing in connection with the other grounds advanced by defendant in support of his motion for a new trial.