**UNITED STATES of America**

v.

**Frank J. BRASCO, Defendant.**

**No. 73 Cr. 985 (JMC).**

United States District Court, S. D. New York.

Nov. 22, 1974.

See also, D.C., 385 F.Supp. 964.

Paul J. Curran, U. S. Atty., S.D.N.Y. (Edward M. Shaw and Barbara Jones Ambler, Sp. Attys., Dept. of Justice, of counsel), for the Government.

Lyon & Erlbaum, Kew Gardens, N. Y. (Herbert A. Lyon and Charles Wender, Kew Gardens, N. Y., of counsel), for defendant.

## MEMORANDUM OPINION

CANNELLA, District Judge:

After a trial of some four weeks in duration, a jury found Frank J. Brasco, a United States Congressman, guilty of conspiracy, 18 U.S.C. § 371, to violate three substantive federal statutes (18 U.S.C. §§ 201, 203 and 1341). On October 10, 1974, in advance of imposition of sentence, Brasco moved for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure. In so moving, he asserted two grounds: (1) "directing that a new trial be conducted due to the improper conduct and handling of the jury during sequestration;" and (2) "[s]triking the testimony [of] John M. Masiello, and setting aside the verdict and directing that a new trial be conducted . . . ." After an evidentiary hearing which was conducted on October 19 and 21, 1974, the Court ruled upon this motion as follows: "The motion is denied as to the first ground stated, memorandum to be filed, and as to the second ground stated upon memorandum previously filed [385 F. Supp. 964, (S.D.N.Y.1974)]." The ensuing paragraphs constitute the memorandum referred to in the Court's earlier ruling.

## THE STANDARD

The general propositions and rules of law which are applicable to a motion for a new trial premised upon an assertion of misconduct by trial jurors have been cogently and succinctly stated by Judge Harvey in United States v. Rocks, 339 F.Supp. 249, 253–254 (E.D.Va.1972).

With limited exceptions, it is a settled rule that a juror's testimony is not receivable to impeach his own verdict. (citations omitted) The inviolability of the jury room from outside influence of any sort is a prime necessity in the administration of justice. (citations omitted) As the Supreme Court said in McDonald v. Pless, 238 U.S. 264, 267 [35 S.Ct. 783, 784, 59 L.Ed. 1300] (1915), if

there were not strict limits to inquiries into jury verdicts after they had been returned, then jurors "would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict." Litigation must be terminated at some reasonable point and if jurors could, without limitation, be examined concerning their deliberations and their verdict, the result would be to make what was intended to be a private deliberation into a constant subject of public investigation impeding frankness and freedom of discussion in the jury room. (citations omitted)

In United States v. Crosby, 294 F.2d 928, 950 (2d Cir. 1961), cert. den. Mittleman v. United States, 368 U.S. 984, [82 S.Ct. 599, 7 L.Ed.2d 523] (1962), the Court listed the dangers inherent in a post-verdict inquiry into jury verdicts as follows (at 950 [82 S.Ct. 599]):

> "There are many cogent reasons militating against post-verdict inquiry into jurors' motives for decision. The jurors themselves ought not be subjected to harassment; the courts ought not be burdened with large numbers of applications mostly without real merit; the chances and temptations for tampering ought not be increased; verdicts ought not be made so uncertain."

An exception to the general rule limiting post-verdict examination of jurors is recognized when it appears that matters not in evidence may have come to the attention of one or more jurors so as to violate the defendant's constitutional right to be confronted with the witnesses against him. (citation omitted) Thus, a juror may testify to facts bearing upon the question of the existence of any such extraneous influence, but not as to how far that influence operated upon his mind. (citations omitted) A new trial is mandatory if it appears in a criminal case that individual jurors have read newspaper articles containing incompetent and prejudicial information. (citation omitted) However, the manner in which a Court should determine whether a jury has been subjected to ouside influence should be left to the discretion of the trial judge. Marshall v. United States, 360 U.S. 310 [79 S.Ct. 1171, 3 L.Ed.2d 1250] (1959). As the Supreme Court said in that case (at page 312, 79 S.Ct. 1171, at page 1173):

> "The trial judge has a large discretion in ruling on the issue of prejudice resulting from the reading by jurors of news articles concerning the trial. Holt v. United States, 218 U.S. 245, 251, [31 S.Ct. 2, 6, 54 L.Ed. 1021]. Generalizations beyond that statement are not profitable, because each case must turn on its special facts." [1]

In this regard, it must be noted that prejudice on the part of any juror is not presumed, rather, the defendant must prove prejudice by a preponderance of the credible evidence. United States v. Cashio, 420 F.2d 1132, 1136 (5 Cir.), cert. denied, 397 U.S. 1007, 90 S.Ct. 1234, 25 L.Ed.2d 420 (1970); United States v. Provenzano, 240 F.Supp. 393 (D.N.J.), aff'd, 353 F.2d 1011 (3 Cir. 1965) (per curiam), cert. denied, 384

---

[1]. (Citations omitted). *See also*, Mattox v. United States, 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917 (1892); United States v. Dioguardi, 492 F.2d 70, 78–81 (2 Cir.), cert. denied, —— U.S. ——, 95 S.Ct. 134, 42 L.Ed. 2d 112 (1974); United States v. Rattenni, 480 F.2d 195 (2 Cir. 1973); United States ex rel. Owen v. McMann, 435 F.2d 813 (2 Cir. 1970), cert. denied, 402 U.S. 906, 91

S.Ct. 1373, 28 L.Ed.2d 646 (1971); Miller v. United States, 403 F.2d 77, 83–84 (2 Cir. 1968); United States v. Procario, 356 F.2d 614 (2 Cir.), cert. denied, 384 U.S. 1002, 86 S.Ct. 1923, 16 L.Ed.2d 1015 (1966); 8 Wigmore, Evidence § 2349 et seq. (McNaughton Rev. 1961); ABA, Standards Relating to Trial by Jury § 5.7.

U.S. 905, 86 S.Ct. 1340, 16 L.Ed.2d 358 (1966).

## THE "OTHER GROUNDS"

■ In accordance with the principles set forth above, as well as the directive of Mr. Justice Clark, sitting by designation, in United States v. Rattenni, 480 F.2d 195 (2 Cir. 1973), that the Court ask each juror individually whether the extrajudicial matter which allegedly came to the jury's attention biased or prejudiced that juror in any fashion against the defendant, this Court directed that a post-trial evidentiary hearing be conducted concerning the matters contained in defendant's motion. In advance of such hearing, the attorney for the Government conceded as true for purposes of the motion each and every allegation of the moving affidavits *except* for that which asserted improper conduct and prejudice on the part of several jurors as the result of their having read a newspaper account directed at Masiello's failure to testify at trial.[2] The Court is of the view that the attorney for the Government correctly conceded the points which he did. These allegations, at best, demonstrate violations of the Court's sequestration order either by the members of the jury or the marshals assigned to supervise the panel. However, accepting these assertions as true, the Court is unable to perceive one scintilla of prejudice in-

uring to the defendant as a result. Defendant wholly failed to show that at the point in time that the case was given to the panel for its deliberations, any juror was intoxicated, fearful or otherwise incapacitated or unable to discharge his or her duties by incidents which had occurred during the sequestration. In short, Brasco has failed to sustain the initial burden of alleging any prejudice as a consequence of these incidents.[3]

## THE NEWSPAPER ACCOUNT

■ At the hearing which was conducted by the Court with regard to the allegation of prejudice to the defendant as a result of the "Masiello newspaper article" (the article in question is said to have discussed the refusal of Masiello to testify at trial and is alleged to have given the reason therefore as his concern over the health of his wife and the consequences that his giving testimony would have upon her),[4] ten of the trial jurors were present and gave testimony under oath. In addition, one juror, Mrs. Anderson, was interviewed by the Court via telephone, as she was at that time visiting her son in Iowa and, another juror, Mr. Aponte, was interviewed by the Court subsequent to the completion of the evidentiary hearing but prior to the filing of this memorandum.[5]

Brasco raised the issue concerning the "Masiello newspaper report" by

---

2. The other instances of jury misconduct asserted by Brasco in support of the motion are: (1) a beer party where seventy cans of beer were in a bathtub; (2) broken windows in juror Rivera's room, (3) non-monitoring of telephone calls; (4) non-supervision of Sunday buffets; (5) excessive drinking of intoxicants on the night before deliberations; (6) home visits of Jurors Lazarou and Anderson; (7) "the manhandling of the jurors by the marshals, including arbitrary refusal to allow the jurors reasonable exercise;" and (8) visits by jurors to the beauty parlor and barber shop.

3. *See, e. g.*, United States v. Procario, 356 F.2d at 618–619; Baker v. Hudspeth, 129 F.2d 779, 782–783 (10 Cir.) ("[T]he use of intoxicants has no proper place in the administration of justice and its use cannot be condoned where justice sits, but there is nothing in this record from which it can be

inferred that any juror was intemperate, or that his conduct was unbecoming to a gentleman. Furthermore, nothing but ugly and ill-founded insinuations can be drawn from the association of the jurors with the lady Deputies."), cert. denied, 317 U.S. 681, 63 S.Ct. 201, 87 L.Ed. 546 (1942); Annotation, Use of Intoxicating Liquor by Jurors: Criminal Cases, 7 A.L.R.3d 1040 (1966 and Supp. 1974).

4. It is to be noted that Jurors Purpo and Hutton have each identified a different article as that which was in the Post on the night in question: Hutton, petitioner's exhibit 1 and Purpo, petitioner's exhibit 2 (exhibit A to Barbarino affidavit) (this article, ex. 2, also makes reference to a purported "contract" being out on Masiello's life).

5. At the hearing, in order to prevent impermissible questioning of the jurors beyond the

means of the affidavit of Dominick Barbarino, submitted in support of the motion.

> . . . Marie Purpo stated that during the course of the trial she had occasion to be in one of the recreation rooms at the Skyline Motel, at approximately 1:00 A.M., at which time she was approached by a fellow juror, Edward Hutton. Hutton then showed her a newspaper article from The New York Post. (Hutton told her that he had read the entire article). She then told me that she read a portion of the article and that it stated, in words or substance, that John Masiello had refused to testify at the Brasco trial because he feared that by testifying he would place his wife's life in jeopardy. She further stated that she and Mr. Hutton ripped the article out of the newspaper and flushed it down the toilet. Marie Purpo described said article as being a long, thin article. She further advised me that the following morning she and Mr. Hutton told Marshal Bob White what had happened regarding the newspaper article and that she was unaware of what, if any, action Mr. White took upon receiving the information.

Barbarino Affidavit at 4–5. The issue thus framed, each juror was questioned individually concerning the newspaper incident.

The two principal "offenders" according to Barbarino, Miss Purpo and Mr. Hutton, both testified under oath and each denied the essential elements of Barbarino's account. Miss Purpo testified unequivocally that she did not, at any time, read the substance of the newspaper account.[6] This testimony is corroborated by a statement made by Juror Purpo during a telephone conversation with Mr. Barbarino, which was taped by Barbarino without Purpo's knowledge or consent. (Tr. at 232–36)

The following questions of the Court and responses by Miss Purpo are instructive:

Q. Miss Purpo, at any time from the time that you heard the charge from the Court and you went into the jury room and you deliberated until the time that you came up with a verdict, was there anything in your own mind which in any way you feel was affected by the fact that you had seen this article?

A. No, sir. Definitely not.

Q. And your judgment was not in any way affected by the fact that you had seen and torn up this article, or whoever tore it up, and flushed it down in the bathroom, wherever it was?

---

limited scope for which the Court was convened, the Court placed certain restraints on the nature of the questions which were to be asked by counsel, and, in some instances, conducted the inquiry itself. *See, e. g.*, Miller v. United States, *supra*; United States v. Rocks, *supra*.

The present post-trial motion alleging misconduct on the part of the trial jurors and the Marshals arose as a result of a "systematic" post-verdict investigation on Brasco's behalf by Mr. Barbarino and others, with the knowledge of Mr. Lyon, Brasco's attorney, but without first informing or seeking the approval of the Court or the attorney for the Government. This type of unsupervised inquiry is neither approved of nor condoned by this Court. Rather, the Court heartily subscribes to the views recently expressed by Judge Brewster in United States v. Sanchez, 380 F.Supp. 1260, 1265–1266 and n. 12 (N.D. Tex.1973). *See also*, United States v. Dris-

coll, 276 F.Supp. 333 (S.D.N.Y.1967); United States v. Miller, *supra*; Code of Professional Responsibility, EC–7–29 to 7–32 and DR–7–108. In this regard, it is well remembered that

[h]e who makes studied inquiries of jurors . . . acts at his peril, lest he be held as acting in obstruction of the administration of justice. . . . [A] searching or pointed examination of jurors in behalf of a party to a trial is to be emphatically condemned. It is incumbent upon the courts to protect jurors from it.

Rakes v. United States, 169 F.2d 739, 745–746 (4 Cir. 1948). Hence, all post-trial questioning of jurors must only be conducted under the strict supervision and control of the court, with the inquiry restricted to those matters found by the court as both relevant and proper.

6. See Appendix A.

A. No.

Q. Was it any part of your judgment or in the deliberations did you take this into consideration at all in any shape or fashion?

A. It was forgotten, Judge.

Tr. at 50–51.

Mr. Hutton, the other juror alleged by Barbarino to have read the newspaper account of Masiello's refusal to testify, flatly denied any knowledge of the reasons for Masiello's refusal to testify. In substance, Hutton testified that he had come upon the involved newspaper account of the trial while perusing an edition of The New York Post and that, upon observing the headline and the initial portion of the story, he realized that it concerned the trial and immediately ceased further reading of it; subsequently, he destroyed the article.[7] Questioned by the Court, Mr. Hutton stated:

Q. Am I right in summarizing your testimony to the effect while you saw this article, and you indicated it was about the case you never told anybody even about what you had read as far as you had gone, and nobody else saw it, as far as you knew?

A. I indicated the title that I had read.

Q. The title, the stand-in?

A. Yes. But beyond that, nothing, because I had not myself read it.

Q. Then you didn't say [should read see] any of the other things that appear in the article further on past the first mention of his [Masiello's] name?

A. No, sir.

Tr. at 91–92. Thereafter, the next day Mr. Hutton gave further answers to questions addressed by the Court:

THE COURT: When you entered in your deliberations in the jury room at the time you arrived at a verdict, what, if anything, about that article did you remember. What did it say as far as you were concerned?

A. What I remembered was what I said, that the hearing was something like, "stand-in testifies for mob figure."

THE COURT: Anything else?

A. And—no. That was it, and that I had seen the name Masiello in the article and that is when I decided not to read it, obviously.

THE COURT: And that is all you knew at the time you started your deliberations?

A. Yes, sir.

THE COURT: Did you know, for example, at that time that it was alleged in that article that Masiello refused to testify because of the fact that his wife's health was concerned and there was some threat of his being out on a contract or some such langauge?

A. No, I didn't know that.

THE COURT: You didn't know that?

A. No, I did not.

THE COURT: Did anything that appeared in the article in any way interfere with your judgment or prejudice you in any way against the defendant as far as you yourself were concerned?

A. No, sir.

Tr. at 281–82.

In addition to Jurors Hutton and Purpo each and every other juror that participated in the deliberation and decision of this cause was questioned concerning the "newspaper incident." Four jurors stated that they were wholly unaware of the Masiello article or the incidents surrounding its discovery by Hutton.[8] Six other jurors recounted

---

7. See Appendix B.

8. Jurors Hall (Tr. at 103–04), Fine (Tr. at 123), Lazarou (Tr. at 269–70), and Aponte

(The Court was unable to secure the appearance of Mr. Aponte during the hearing on this motion, however, Mr. Aponte was subsequently interviewed by telephone on Oc-

that while they were aware of the article and the incident surrounding its discovery, they had no knowledge of the substance of its contents.[9] Upon the inquiry of the jurors, this Court unhesitatingly concludes that no juror had any knowledge whatever of the sum or substance of the "Masiello newspaper account."

The encounter of several of the trial jurors with the "Masiello" newspaper article is not to be considered by the Court as *per se* prejudicial to the defendant. "Whether publicity is so prejudicial as to require a new trial is ordinarily committed to the trial judge's discretion. 'Generalizations beyond that statement are not profitable, because each case must turn on its special facts.'" United States v. Armone, 363 F.2d 385, 396 (2 Cir.) (quoting from, Marshall v. United States, 360 U.S. 310, 312, 79 S.Ct. 1171, 3 L.Ed.2d 1250), cert. denied, 385 U.S. 957, 87 S.Ct. 391, 17 L.Ed.2d 303 (1966). Rather, on the instant record, the Court finds that defendant has failed to sustain his burden of proving that any juror who came into contact with the newspaper article was thereby prejudiced against him or that the incident in any manner acted to impair his securing of a fair trial. "Even if the jurors read the article referred to, that alone is not ground for a new trial. . . . The burden was upon counsel for defendant to show that

prejudice resulted, and he failed to establish such prejudice." Gicinto v. United States, 212 F.2d 8, 10–11 (8 Cir.), cert. denied, 348 U.S. 884, 75 S.Ct. 125, 99 L.Ed. 695 (1954).

This Court has had ample opportunity to observe these jurors throughout the trial of this case, as well as their demeanor and bearing when called as witnesses upon the hearing of this motion. During the trial, the jurors conducted themselves in an alert and intent fashion and, the manner in which they conducted their deliberations (as is well evidenced by the pointed and relevant questions going to the heart of the case which were asked by them) demonstrates their understanding of both the law and the facts. This jury did not appear to the Court to be inattentive, disinterested or close-minded. As witnesses, each juror impressed the Court as an honest and sincere individual who had discharged his or her duty in accordance with the juror's oath. Each juror that had come into contact with or had been made aware of the "Masiello" article, unequivocally stated that his judgment in this case was not affected by this extrajudicial account and that he was not prejudiced against the defendant in any fashion whatever because of it. The Court believes these jurors. Notwithstanding the testimony of Messrs. Lyon and Erlbaum and that of Miss Romaner, the Court believes the in-court testimony of Miss Purpo.[10] She stated, under oath,

tober 22, 1974 at approximately 6:00 P.M. and was questioned at that time by my law clerk, Mr. Kaplan, in the presence of my other law clerk, Mr. Danilow. In response to Mr. Kaplan's questioning, Mr. Aponte stated that he was unaware of the involved article.).

9. Jurors Chiang (Tr. at 96–97), Benjamin (Tr. at 106–07), Rivera (Tr. at 113–14), Robbins (Tr. at 264–65), Rambach (Tr. at 271–73), and Anderson (Mrs. Anderson was in Iowa at the time of the hearing on this motion. She was interviewed by the Court, by telephone, during the course of the hearing. Tr. at 335–37. Subsequently, she wrote in a letter of October 21, 1974, as follows: "In reference to our phone conversation earlier today, I wish to further explain my reactions regarding the article Mr. Ed

Sutton [sic] removed from the newspaper concerning the trial. I did not personally view the clipping. Instead, I was told that the article had been thrown away, and the contents of the clipping were not revealed or discussed with me at any time. Therefore, it failed to influence my decision on the case in any way.").

10. Messrs. Lyon and Erlbaum and Miss Romaner testified in substance that during an interview with Miss Purpo which was conducted in Mr. Lyon's apartment, the juror stated that the article which she had seen during the sequestration related,

to the fact that he didn't want to testify, and she recalled that he was concerned for his—for the life of his wife, in words or substance—I don't remember the exact

that she had seen only "the heading and . . . the first paragraph" of the article, but that she "didn't even read it." The Court believes this statement, as well as her representation that the newspaper incident "was forgotten" and did not in any way affect her judgment in this case.

As has been stated, "[t]he mere fact that jurors have read newspaper accounts of the trial in which they are participants is not ground for a new trial," Bratcher v. United States, 149 F.2d 742, 746 (4 Cir.), cert. denied, 325 U.S. 885, 65 S.Ct. 1580, 89 L.Ed. 2000 (1945), rather, "[t]he crucial question in cases such as this is the degree of prejudice created by the improper publicity, since a new trial is required only when substantial prejudice has occurred." United States v. D'Andrea, 495 F.2d 1170, 1172 (3 Cir. 1974). On the state of the record before it, not only does the Court perceive no substantial prejudice to the defendant as a consequence of the jurors' contact with the article, but, indeed, the Court cannot find the slightest suggestion of prejudice of whatever nature to have been demonstrated by the defendant. *See, e. g.,* United States v. Wilshire Oil Co., 427 F.2d 969, 975 (10 Cir.), cert. denied, 400 U.S. 829, 91 S.Ct. 58, 27 L.Ed.2d 59 (1970). While it is true that a "verdict must be set aside where even one juror in effect admits prejudice; after all, a defendant is entitled to twelve fair and impartial jurors. . . ." United States v. Rattenni, 480 F.2d at 198, here, no juror has so admitted and the Court cannot, on this record, so infer.

## CONCLUSION

It was upon the request of the defendant and over the objection of the Government that the Court acted to sequester the jury in this cause. It did so in an effort to better insure that the defendant would receive a fair trial in what might be termed a "high publicity" case. *But a fair trial does not mean a perfect trial* and the defendant, despite his protestations, did receive a fair trial and the verdict of an impartial jury.

This is not to say that violations of the Court's sequestration order did not occur. The proof well demonstrates that they did, and that several jurors did come into contact with extrajudicial matter. But perfection is far too elusive a standard upon which the fairness of a trial might be judged and sequestration cannot be viewed as "perfection" insurance. Rather, sequestration is but a means invoked by the Court to effectuate the goal of affording a defendant a fair trial by a fair and unbiased

---

words—and she wasn't sure—she said definitely she had not read the whole article. She wasn't sure whether she had only read the first paragraph, but she knew that she had read just enough of it not to read any further, she said; but that much she read. And she also said that Ed Hutton had read more—that Ed Hutton, as a matter of fact, was the one who showed her the article. Tr. at 325.

Or as the statement of Miss Purpo was later summarized by Mr. Lyon in response to a question by Mr. Shaw:

Q. Mr. Lyon, your testimony here today, as I understand it, is that on two occasions on that evening when Miss Purpo was at your home, she stated directly to you or directly within your earshot that an article she had seen during the course of the trial contained in it a statement that the reason Masiello did not testify was that he was afraid for his wife's safety. Is that right?

A. Well, she didn't state it that succinctly. She stated it exactly the way I stated it: That there was an article which had something to do with the fact that Masiello didn't testify and had some discussion about the fact—and I am talking words or substance—some discussion about the fact that he was afraid for his wife's life. She did not state it in the precise lawyer-like language that you are using now. Tr. at 328–29.

At best, the statements of Miss Purpo on the occasion of her interview in Mr. Lyon's apartment are somewhat inconsistent with those made by her under oath, and thus may be considered as bearing upon her credibility as a witness. However, they are not such as would render her in-court, under oath, testimony unworthy of belief or allow the Court to infer any prejudice on her part against the defendant.

jury. Dissatisfied litigants should not, upon the close of their own trial, proceed to try the jury upon assertions of irregularities and hearsay innuendo. In the opinion of this Court, taking into account the myriad of circumstances surrounding the nature and conduct of this trial, Frank Brasco received a fair trial and was found guilty by a fair jury composed of honest, sincere and unbiased people. As Mr. Justice Story, sitting as Circuit Justice in United States v. Gibert, 25 Fed.Cas. 1287, 1310 (No. 15,-204) (C.C.D.Mass.1834), well stated with respect to a sequestered jury:

> We must take things as they are in our days. Juries cannot now, as in former ages, be kept in capital cases upon bread and water, and shut up in a sort of gloomy imprisonment, with nothing to occupy their thoughts. It would probably be most disastrous to the administration of justice, and especially to prisoners, to attempt, in these days, the enforcement of such rigid severities, so repugnant to all the usual habits of life. And for one, I am not satisfied that the irregularity in the present case has been in the slightest manner prejudicial to the prisoners . . . . The indulgence ceased the moment when the charge was given, and the jury were then put upon their own solemn and exclusive deliberations on the case.

It is so ordered.

## APPENDIX A

The relevant portions of Miss Purpo's testimony are as follows:

Q. Did you read some of the article?

A. I didn't read the article but from what I was told by Mr. Hutton, it had to do with the Brasco case.

THE COURT: Never mind what you were told. You didn't read the article, period. Strike out the rest of it.

Q. Did you see some of the article, the first paragraph of the article?

A. I saw it.

Q. Did you see enough to have any idea of what the article was about?

A. No.

Q. Now I am going to ask you, were you told anything about the contents of the article?

A. About the contents? No.

Q. Were you told anything about the article?

A. Yes, that it dealt with the case.

Q. Were you told anything about whether the article referred to Mr. Masiello at all?

A. I don't remember.

Tr. at 16.

Q. Is there anything you knew about the contents of that article from any source whatsoever during sequestration?

A. That night, yes.

Q. What did you know about it?

A. That it dealt—that that particular article dealt with Mr. Masiello's not appearing in court.

Q. Do you remember where that article—in which newspaper that article was printed?

A. From what I remember, Mr. Lyon, it was either in the New York Post or the Daily News. I can't place my finger on which exactly.

Q. Can you describe the physical appearance of the article, whether it was a three-column—

A. Yes.

Q. What kind of article?

A. It was a long, thin article.

Q. And were you ever shown articles from the Post and from the News relating to Mr. Masiello's refusal to testify?

MR. SHAW: Is this before or after the verdict?

MR. LYON: After the verdict.

A. Yes.

Q. By whom?

A. By Mr. Barbarino.

Q. Were you also shown such articles by me?

A. Yes, sir. . . .

Q. Well, what did you say with relation to the articles shown you by me? Could you identify them?

A. They were not familiar to me.

Q. They were not familiar?

A. No.

Q. Were you shown articles by anyone else?

A. No, sir.

Q. Didn't Mr. Barbarino show you articles?

A. I stated he did show me, sir.

Q. I am sorry. I forgot that. Now, how many articles did he show you?

A. Oh, I don't remember. Maybe two or three. I really don't remember. . . .

Q. What did you say in response to the articles Mr. Barbarino showed you?

A. That I don't remember seeing them before. . . .

Q. Did you say anything other than that you don't remember seeing any of them before?

A. That one may be familiar. That any long, thin article would look familiar to me.

MR. LYON: Your Honor, I want to show the witness part of the affidavit which is in a Court file. Perhaps I will use that.

THE COURT: Are you referring to Exhibit A?

MR. LYON: Yes, that's right.

Q. Could you look at that article, at that exhibit?

MR. LYON: I suggest we ought to identify that for the record.

THE COURT: Exhibit A of the moving papers.

MR. LYON: Thank you.

Q. Were you shown that article by Mr. Barbarino:

A. I believe so.

Q. And what was your response?

A. That this might have been the article. . . .

Q. Can you tell us what else happened after Mr. Hutton told you about the article?

A. After he told me about the article, I looked at it and I said, "Gee, Ed, you better rip it out," and he proceeded—I don't remember if he ripped it out or I ripped it out, but it was ripped out of the paper, and it was flushed down the toilet bowl.

Q. Looking at the article that you hold in your hand, do you see the next-to-the-last paragraph?

A. Yes, sir.

Q. Could you read that next-to-the-last paragraph to yourself?
(Pause.)

Q. I'm sorry, there is no reason to read it to yourself. I will read it aloud: "Sources close to the case said Masiello had declined to testify because he was worried about the consequences his testimony might have on his wife Elizabeth's health."
Did you hear that from anybody during the sequestration?

A. No, sir.

Q. Did you hear that from Mr. Hutton?

A. No, sir.

Q. Did you know from any source at all during the sequestration that Mr. Masiello said he was concerned about his wife's health?

A. No, sir. . . .

Q. Did you tell anybody else that you gleaned that information from a conversation about a newspaper article?

A. No, sir.

Q. You didn't tell that to Mr. Barbarino?

A. About this article?

Q. Not about the particular paragraph, but that you were aware that Mr. Masiello was concerned about his wife's health?

A. Oh, no, sir.

Q. You say you flushed it down the toilet. Who did that?

A. Oh, I don't recall. It was either Mr. Hutton or myself.

Q. Could you tell us why you did that?

A. Well, because we knew it wasn't supposed to be in there. I guess it was just, you know, a cover-up for—we either were covering up for the other jurors not to see it or a mistake one of the marshals had done, knowing this article wasn't supposed to be in the paper.

Q. Did you inquire of any of the other jurors whether they had seen this article?

A. No. . . .

Q. Did you tell the judge anything about this?

A. No, sir.

Q. At some time during the sequestration, did you have any further conversations with anybody about the article?

A. No, sir.

Q. Did you ever discuss it again with Mr. Hutton?

A. The next morning.

Q. What did you do the next morning?

A. We spoke about bringing it to the attention of one of the marshals.

Q. When you say "we," whom do you mean?

A. Mr. Hutton and myself.

Q. Did you bring it to the attention of one of the marshals?

A. Yes, sir.

Q. To which marshal did you bring it?

A. Mr. White.

Q. What did you tell him?

A. We told him that last night while Ed Hutton was glancing through the papers, he came across this article that should not have been in there, and that whoever is cutting out the articles from the paper that particular week should be a little more careful, and he said he would take care of it.

Q. The headline of the exhibit I gave you, do you recognize that headline?

A. No, sir.

Q. Now, you said that Mr. Hutton told you about it and then you glanced at it.
Is that correct?

A. Yes, sir.

Q. Would you tell us what portion you glanced at?

A. Just the heading. And then—Mr. Hutton was sitting down—if I may explain it—he was sitting down and he called me into the recreation room that he was in, and he said, "Marie, look what I have found."
I looked at it. But he had the paper in his hand and it was just a glance I took on it.

Q. Were you looking over his shoulder?

A. Yes.

Q. Was Mr. Hutton sitting at a table?

A. Yes, sir.

Q. And he had the paper in front of him?

A. He was sitting in a chair, having the paper in front of him.

Q. Was the paper opened on the table?

A. He didn't have it on the table, sir. He was holding it.

Q. He was holding it then?

A. Yes.

Q. And it was open?

A. Yes.

Q. And you were able to see it over his shoulder?

A. Yes.

Q. How much of it did you see?

A. Mr. Lyon, I would see the heading and, you know, the first paragraph. I didn't even read it.

Tr. at 18–27.

## APPENDIX B

In pertinent part Mr. Hutton testified as follows:

BY MR. LYON:

Q. Mr. Hutton, during the sequestration, the period of sequestration of the jury in the case of United States v. Frank Brasco, did there ever come a time when you discussed a newspaper article with Miss Purpo, an article relating to the Brasco trial?

A. Yes.

Q. When was that, to the best of your recollection?

A. I don't know the date. I know it was around the time that Masiello testified, the stand-in for Masiello, testified.

Q. Masiello testified, you said?

A. The stand-in for Masiello testified.

Q. Where was it?

A. The recreation room at the Skyline.

Q. Can you tell us what time it was?

A. To the best of my recollection, it was 8:30 or 9:00 o'clock in the evening.

Q. Did there come a time when you you were holding the article in front of you and Miss Purpo looked over your shoulder?

A. I don't recall.

Q. You don't recall that?

A. No. . . .

MR. LYON: Will your Honor show the witness the exhibit? May we identify it again? That is Exhib-

it A, I believe, in Mr. Barbarino's affidavit.

Q. Can you tell me, is that the article that you saw?

A. No, it is not.

Q. Could you describe the article that you saw?

A. The article that I saw, the heading was something to the effect "Stand-in Testifies"—no, "Stand-in Witness testifies for Masiello, a reputed Mafia. Stand-in testifies for reputed Mafia."

That is not verbatim, but that's to the effect, and I know the word "stand-in" was there. I am pretty sure.

Q. What else did the article say?

. . .

A. I don't know. I didn't read it.

Q. None of it?

A. No. The only thing is, I was reading the Post—it was in the Post, I believe, and I got to that point, saw the heading, and it struck me immediately, and then I saw the name John A. Masiello somewhere and that is when I immediately realized it was in connection with the case, so I didn't read any further, I didn't read anything. . . .

Q. Would you look at Exhibit 1 for identification? Would you look at this article and tell us, is that the one?

A. That is the article.

Q. You say that is the article you saw?

A. I believe that is the article, yes.

Q. You believe that is the article you saw that night, and did you show it to Miss Purpo?

A. What I did was, to the best of my recollection, I just pointed out that the marshals had neglected to extract that article, how stupid it was because they were supposed to take out any articles obviously

related to the case and beyond that, relating to any crime or political—

Q. I didn't hear the last part.

A. Anything having to do with political trials. . . .

Q. At any time in any shape or form, did you ever show the article to Miss Purpo?

A. I may have held it up and let her see it from a distance and have her glance. I know in my presence she did not read it, unless she read it over my shoulder, which I said I don't recall. . . .

Tr. at 57–60. Later in his testimony, Hutton responded to the following questions:

Q. . . . Now, what did the other jurors say, if anything, while you were holding onto the newspaper for 20 minutes?

A. The only thing that I can imagine they would say would be that it was sort of funny that they had left it in there, that it was—

Q. Well, of course, you are imagining. Can you remember what they said?

A. I know that's the way I presented it, and I—no, I don't remember what they said.

Q. You don't remember what they said?

A. No. I don't remember what they said.

Q. You don't remember whether they said anything at all? Is that correct?

A. That's right. That's correct.

Q. And you don't remember whether any of them said, "Let me see it"?

A. No, I don't remember. No one else read it while it was in my possession unless they read it over my shoulder, me not being able to see them, because I know I intentionally did not read it and obviously I was not going to have

someone else read it for the same reason, because we were instructed not to.

Q. You are not sure whether Miss Purpo read it over your shoulder or not, are you?

A. I am not positive. I don't know where she was seated. I don't know if she was in the room. . .

Tr. at 73–74. Still further on, he stated:

Q. Are you saying you don't know Masiello refused to testify?

A. What I got from the article was I believed I had known that he was not testifying for himself. I didn't know if he had refused or— you know, I didn't know the circumstances behind it, I just knew he was not testifying for himself because it says a stand-in.

I also believe that this article came after the first day of Masiello's stand-in testifying so that I was familiar that he wasn't going to testify anyway.

Q. You knew that without the article?

A. I knew—I believe that the article —I shouldn't say. I don't know.

Q. You can go ahead with whatever you wanted to say unless you decided you don't want to say it. You started to say you believe something.

A. I started to say that I believe this article came after at least the first day of the stand-in's testimony. Okay, I believe that I saw the article after I had already known that Masiello was not going to testify for himself.

Q. Did you come to—a point I think you mentioned earlier, that you saw the name John A. Masiello or the name Masiello in the article.

Do you recall saying that?

A. I recall saying that. And I think I recall seeing that vaguely.

Q. In the article, is that correct?

A. I vaguely recall that, yes, sir, and that is when I stopped. . . .

Q. Will you look at the article, please, and see whether you can find the name Masiello?

A. Yes.

Q. And that is about where?

A. That is about one-third of the way down was the first time I just found it.

Q. And before the name Masiello, do you see a reluctant, something about being a reluctant witness?

A. I saw it there, and I don't see the reluctant witness, no, sir.

Q. Will you go further?

A. Up?

Q. Yes. Up.

A. "Reluctant."

Q. And does that say "A reluctant government informer in the influence peddling trial of Representative Brasco"?

A. Yes, sir. That is what it says.

Q. And that is before the name John Masiello, is that correct?

A. Yes, it is. Could I take one more look at that?

Q. Sure.

A. I want to make sure his name doesn't appear before that.

Q. Certainly. I would like to look for the same reason. Go ahead.

(Pause.)

A. Okay.

Q. At any time after the dummy appeared—no, I will withdraw that.

Before the stand-in appeared for Masiello, were you given some instructions by the Court as to whether or not Mr. Masiello was going to testify?

A. Before?

Q. Yes.

MR. SHAW: Excuse me, either he was or he wasn't.

Does this witness' present recollection of that fact have any relevance?

I object.

THE COURT: I don't know the point. There is something in the affidavit about somebody saying the judge said something about it.

I have no present recollection of saying anything about it, but I don't know.

Q. Do you recall?

A. I don't recall either, no, sir.

Q. When the stand-in witness appeared, you knew who the stand-in witness was, didn't you?

A. At that time?

Q. Yes.

A. I think he was—I don't remember. I think he was announced as a— I don't know—no, I don't know. No, I don't.

Q. You didn't know whether he was employed by anybody or—

A. I know now that he was employed by—I think he was in the Justice Department, and I believe—

Tr. at 82–85.