UNITED STATES of America,
Plaintiff-Appellee,

v.

ALLIED STEVEDORING CORPORA-
TION, John Ward, and Michael Bowers,
Defendants-Appellants.

No. 393, Docket 25154.

United States Court of Appeals
Second Circuit.

Argued June 6, 1958.

Decided July 11, 1958.
Certiorari Denied Oct. 13, 1958.
See 79 S.Ct. 58.

See also 143 F.Supp. 947.

George I. Gordon, Asst. U. S. Atty.,
S. D. N. Y., New York City (Paul W.
Williams, U. S. Atty., New York City, on
the brief), for plaintiff-appellee.

Henry A. Lowenberg, New York City,
for defendants-appellants.

Before CLARK, Chief Judge, and
PICKETT and MOORE, Circuit Judges.

CLARK, Chief Judge.

This is a consolidated appeal from the denials of two motions for new trials. In March 1956 the defendants [1] were convicted of attempting to "defeat and evade" the income tax for the year 1951 of Allied Stevedoring Corporation in violation of Internal Revenue Code of 1939, § 145(b). After the denial of a motion under F.R.Crim.Proc., Rule 35, for reduction of sentence, United States v. Allied Stevedoring Corp., D.C.S.D.N.Y., 143 F.Supp. 947, we affirmed the convictions, 2 Cir., 241 F.2d 925, certiorari denied 353 U.S. 984, 77 S.Ct. 1282, 1 L.Ed. 2d 1143. On January 9, 1958, the defendants moved for a new trial under F. R.Crim.Proc., Rule 33, on the ground that they had just discovered that one of the jurors involved in the original conviction possessed and utilized "A Handbook for Petit Jurors" previously issued to him by the Clerk of the United States District Court. After a full hearing the district court denied the motion. D.C. S.D.N.Y., 162 F.Supp. 874. The defendants then made a second attempt to procure the same relief. In support of this motion they produced an affidavit by Joseph E. Potter, the brother of the deceased codefendant, John Potter, which alleged that a third brother, Charles Potter, told Joseph that he knew two of the jurors who convicted the defendants for some time prior to their selection. The district court denied this motion without a hearing. D.C.S.D.N.Y., 162 F. Supp. 879.

■ It is questionable whether the defendants have made an adequate showing that the "newly discovered" evidence was unavailable at the time of the trial, had they exercised the required due diligence in their search for it. United States v. Costello, 2 Cir., 255 F.2d 876, certiorari denied Costello v. United States, 78 S.Ct. 1385; United States v. Hiss, D.C.S.D.N.Y., 107 F.Supp. 128, af-

firmed 2 Cir., 201 F.2d 372, certiorari denied Hiss v. United States, 345 U.S. 942, 73 S.Ct. 830, 97 L.Ed. 1368. But in the interest of the prompt determination of criminal cases we have concluded to examine the merits of the claims made by the defendants and to treat their motions as requests for relief under 28 U.S.C. § 2255, as well as motions made pursuant to Rule 33.

■ The defendants' second motion, chronologically, is so patently weak that it deserves only passing mention. On the original trial the jury submitted a recommendation for leniency with respect to the now deceased codefendant, John Potter. The court first sentenced him to one year and one day in prison, but later, on motion of the defendants, suspended his sentence, while refusing to reduce the sentences of the others. Potter at that time was over 65 years of age and was suffering from cancer. The defendants argue in their motion papers that it was possible that the two jurors who allegedly knew Potter's brother "arranged a deal in the jury room to have leniency recommended for the defendant, John Potter, and then they would vote to convict," and that this fact "could have very easily resulted to the disadvantage of the defendants, Ward and Bowers, and to the advantage of the defendant, Potter." [2] Obviously a jury's differing treatment of codefendants can give rise to much speculation to explain the result. But if each time this occurs the disfavored codefendants are to be afforded the opportunity to recall the jury for a detailed interrogation, one of the cherished features of the jury system—the secrecy which attends its proceedings—will be sacrificed unnecessarily and for no justified purpose. Jurors might be exposed to undue criticism and annoyance or they might find themselves responsive to undue influences if such an easy opportunity were afforded to scrutinize their

1. John Potter, an original defendant, died prior to these motions.

2. Actually, as one juror testified during the hearing relating to the Handbook mo- tion, the jury wished to recommend leniency because of Potter's age and ill health.

deliberations. In this very case, in fact, a shocking attempt was made to influence a juror, who had to be excused in the midst of the trial. D.C.S.D.N.Y., 143 F. Supp. 947, 952. This is not to say, however, that such examinations are prohibited in all cases. See, e. g., Jorgensen v. York Ice & Machinery Corp., 2 Cir., 160 F.2d 432, certiorari denied 332 U.S. 764, 68 S.Ct. 69, 92 L.Ed. 349, and Comment, Impeachment of Jury Verdicts, 25 U. of Chi.L.Rev. 360–372 (1958). But where they are sought, adequate grounds must be disclosed before a hearing will be ordered.

■ Here the affidavit of Joseph E. Potter is patently inadequate to justify a hearing. In it he seeks to establish some kind of acquaintanceship between another brother and two jurors solely on the basis of a hearsay statement of the third brother, who presumably was available to testify. Moreover, the extent of the acquaintanceship is left open for speculation. Certainly if there was any close relationship which would justify doubts as to the impartiality of these jurors, it had to be shown in the supporting papers. Presumably, however, such a relationship did not exist. But most important is the utter absence of any showing that the jurors knew that their "friend" was related to the codefendant, Potter. Obviously this is an essential element in the defendants' argument— one that must be shown to support an invasion of the jury room. This showing is too slight to call for a hearing or to raise any serious doubts regarding these convictions so amply justified by the evidence in the record.

■ The other motion, attacking the propriety of issuing to jurors in criminal cases the "Handbook for Petit Jurors," is also based on evidence which scarcely indicates any prejudice to the defendants. No Handbooks were issued to the panel in this case; but one juror, who testified at the hearing of this motion,

had previously served in the Southern District of New York, at which time, at his request, he had been issued the Handbook now under attack.[3] His lucid testimony established that he had read the Handbook twice, once while awaiting jury service in a prior case and again just prior to the trial in this case. Although he could not remember whether or not he had produced the Handbook in the jury room after the court delivered its instructions, he recalled in great detail that the only time he made any reference to the book was when the jury was discussing its power to recommend leniency for John Potter. At that time he told his fellow jurors that the sentence was for the court, and that the jury had the power only to render a verdict of guilt or innocence. He further testified that he did not rely on the Handbook in any other way, as he considered it only a guide for jurors—not a detailed set of instructions for a specific case.

The effect of the book on the rest of the jury is best illustrated by the fact that they ignored this juror's statement and asked the court for a special instruction concerning the propriety of recommending leniency. Under these circumstances it seems clear that the defendants have not shown any grounds for relief, even if the issuance of the Handbook is considered as a deprivation of the right to a fair trial. All they have shown is that one juror studied a set of general instructions previously given to him at his request and was not affected in any vital way by them, and that the other jurors were wholly unaffected.

We believe that it is worth while, however, to consider the central issue here— the propriety of the book itself. It would serve no useful purpose to set out at length the history of its adoption and use. These facts, together with an excellent discussion upholding the value of the book and the constitutionality of its use, with which we concur, are well set forth in the concurring opinion of Chief

---

3. The Handbook involved here ("A Handbook for Petit Jurors") was an old edition of "Handbook for Jurors serving in the United States District Courts," which has since been revised.

Judge Duffy in United States v. Gordon, 7 Cir., 253 F.2d 177, 185; see also the opinion of Chief Judge Simon in Horton v. United States, 6 Cir., 256 F.2d 138. The defendants' attack on the book consists of isolating specific passages which they regard as prejudicial. Many of these have been deleted in the new and much shortened "Handbook for Jurors" presently in use in the district courts. These excerpts, together with the gist of the defendants' objections, appear in an appendix to this opinion.[4]

Their argument proceeds as if these passages were part of the instructions given to the jury in this case by the district court. But this is unwarranted, for even a casual perusal of the Handbook shows that it was not a set of instructions for any specific case, but rather a general guide to the duties of a juror for persons unfamiliar with this role. This was apparent to the juror who testified here and there is no reason to believe that others would consider it differently. Many persons seem to believe that they have a constitutional right to an ignorant jury uninformed as to their function. But we know of nothing requiring such ignorance as a condition of a fair trial. And we cannot agree that such a requirement would be wise. To fulfill his function effectively, a juror should understand the place of the jury in the judicial scheme. This general guide helps to accomplish this salutary purpose with a minimum of the distortion so often found in a "general" treatment of any subject.

█ An examination of the whole Handbook, rather than just the excerpted portions, shows that it attempts to give prospective jurors a general picture of what occurs at a typical trial. After a prefatory note on the importance of jury service under the American system of administering justice, the book makes reference to the classes of cases, civil and criminal, brought in the federal courts. It then, for illustrative purposes, sets forth a hypothetical case (which is carefully denominated as civil) and follows the case through the six major stages of trial following the *voir dire* examination. Passages then follow which are devoted to the argument of counsel and the charge of the court pointing out what the jury can expect from the lawyers and the judge. Following these is a long passage on criminal cases which discusses indictments, informations, and sentencing. This passage is obviously background material intended to aid the jury to comprehend the nature of a criminal proceeding; it was not intended, nor does it appear, as a statement of all the relevant presumptions and safeguards which attend a criminal case. The balance of the book is devoted to the conduct of the jurors both in court and in the jury room. At the end of the volume there is a set of short definitions of unfamiliar titles to enable the juror to understand the functions of various persons who participate in a trial. The whole book is so obviously a general explanation of courtroom procedure aimed at aiding a layman unfamiliar with judicial proceedings to grasp the nature of his function as a juror that we cannot avoid surprise at the kind of controversy and alarm exemplified in the dissenting opinions in the Gordon case. We find nothing improper in the use of the Handbook. In fact we believe that it accomplishes a necessary purpose and that its use should be encouraged.

Judgments affirmed.

### Appendix

The defendants claim that the following illustrative example of a "typical civil case" would mislead a jury in a criminal proceeding:

"The Six Stages of Trial

"The jury has been sworn and the trial proceeds. The several stages of the trial are six. (1) The opening statements of counsel in which counsel, for the plaintiff, then for defendant, give the jury a preview of what each side will prove. (2)

4. See Appendix infra.

Plaintiff calls witnesses to prove plaintiff's case. (3) Defendant calls witnesses to disprove plaintiff's case, and to establish defendant's contentions. (4) Plaintiff may call witnesses to rebut new matter advanced by defendant's witnesses. (5) The case is argued by counsel. (6) The judge charges the jury as to the law and may advise the jury upon the facts."

The defendants argue that the following statement fails to disclose that the Government has the burden of proving guilt beyond a reasonable doubt:

"What has been said about procedure in the trial of civil cases, applies also in a general way to criminal trials."

But the defendants fail to cite passages having an obvious contrary effect, for instance:

"When persons are charged with offenses against the law, and their guilt has been established beyond a reasonable doubt, juries should have no hesitancy in declaring their guilt. * * * On the other hand, if the guilt of a defendant is not established beyond a reasonable doubt, jurors with equal readiness should render a verdict of 'not guilty.' "

The defendants argue that the following excerpt leads only to the conclusion that the defendant, after indictment, is *required* to present his defense:

"The grand jury meets in secret session. The United States attorney, who is the Government's prosecuting official, presents his charges before the grand jury and produces evidence to substantiate the charges. If after hearing such evidence, the grand jury believes that a crime has been committed and that there is reasonable ground to believe that the defendant is responsible for the crime, it finds a true ·bill of indictment and presents it to the district court. These are technical phrases which mean that the grand jury believes that there is evidence which requires that the defendant be brought to trial on the charges set forth in the indictment. Ordinarily, neither the defendant nor any of his witnesses are heard by the grand jury. Obviously, therefore, only 1 side of the case, that is, the Government's side, is presented before this body. Since our ideas of justice require that a defendant shall have the right to present his defense, the finding of an indictment by a grand jury is not to be considered evidence of the defendant's guilt."

The defendants fail to state the basis of their objections to the following excerpt from the Handbook which deals with punishment:

"The jurors have no concern with the sentence which may be imposed if a defendant is found guilty, and they should not permit consideration of punishment to influence their decision. Our laws give a wide range in the sentences which may be imposed for many offenses and if the jury finds a defendant guilty, it is for the judge to decide what the sentence in the case shall be."

The defendants object that the Handbook fails to state in the following passages that the jury can disregard the testimony of an expert witness:

"Additional Definitions

\* \* \* \* \* \*

"An *expert witness* is a witness who has special scientific or professional training or experience in connection with the particular subject matter about which he is called to testify.

"A *hypothetical question* is a question put to an expert witness which asks his opinion concerning the conclusion to be drawn from stated facts. The facts stated are such as the evidence proves or fairly tends to prove, or proof of which is offered in the case."

We do not gild the lily by further characterization of these contentions.