UNITED STATES of America, Appellee,

v.

Frank MOTEN, Defendant-Appellant.

No. 489, Docket 77–1324.

United States Court of Appeals,
Second Circuit.

Argued Dec. 9, 1977.

Decided May 19, 1978.

Rehearing Denied Sept. 29, 1978.

Ivan S. Fisher, New York City, for defendant-appellant.

Daniel J. Beller, Asst. U. S. Atty. (Robert B. Fiske, Jr., U. S. Atty., Robert J. Jossen, Asst. U. S. Atty., Southern District of New York, New York City, of counsel), for the United States of America.

Before FRIENDLY, SMITH and MESKILL, Circuit Judges.

MESKILL, Circuit Judge:

This appeal, which arises as a result of the efforts of a major narcotics trafficker to secure a new trial, raises important questions regarding the extent to which a convicted defendant must be allowed to investigate suspected misconduct by members of the jury that found him guilty. Appellant Frank Moten's claims have their origin in an incident of jury corruption that has twice before occupied the attention of this Court. *In re Grand Jury Subpoena Served Upon Doe,* 551 F.2d 899 (2d Cir. 1977); *United States v. Moten,* 564 F.2d 620 (2d Cir. 1977).

On April 5, 1976, an indictment was filed in the Southern District of New York. It charged 33 individuals, in 40 counts, with various violations of the federal narcotics laws. Moten was charged with engaging in a continuing criminal enterprise, with conspiracy, and with 4 individual substantive offenses. Moten's co-conspirators included Sebastian Intersimone and Bernard Brightman. Trial began with respect to 22 defendants on August 10, 1976, before Judge Richard Owen and a jury. *See Moten, supra,* 564 F.2d at 622 n.2.

After 6 weeks of trial, on September 20, 1976, the district judge was informed by Intersimone's lawyer, David Doe,[1] that one of the jurors, William T. Keno (juror number 10), had engaged in improper conduct. Doe first brought the matter to the attention of Assistant United States Attorney Daniel J. Beller, and this was followed by an *in camera* consultation between Doe, Beller and the district judge. During the consultation, Doe told the district judge of the following two incidents. First, he revealed that some time after the trial began he was told by Intersimone that Brightman "had approached [him] and said there was a possibility of reaching one of the jurors." Doe told the district judge that his client's original response to this news had been "inappropriate," and he said that he had told his client "in no uncertain terms to go back and tell Bernie Brightman that you want no part of this at all." The second incident had occurred on Friday, September 17, 1976. After court recessed at about 1:00 P.M., Doe, Intersimone and his sister Viola Intersimone,[2] went to 299 Broadway, a short distance from the federal courthouse, where Intersimone's brother-in-law, Anthony Sutera, has a law office. Because of her fear of riding in elevators, Viola Intersimone waited downstairs. While she was waiting outside a Duane Reade discount drug store, juror Keno approached her and asked whether she was Intersimone's wife. She answered that she was his sister. Keno then said he had a message for Intersimone. Viola Intersimone protested that they should not be talking, but Keno nevertheless told her to tell her brother to meet him on the following Monday during lunch. She reported this encounter to Mr. Sutera and he conveyed the story to Doe, who informed Beller and the district judge on Monday morning. The minutes of this consultation were ordered sealed, but their contents were substantially disclosed in the opinion of this Court in *Doe, supra.* They

---

1. We will continue to honor the lawyer's request that we use this pseudonym. *See Doe, supra,* 551 F.2d at 900 n.1.

2. Miss Intersimone commonly goes by the nickname "Yola," which the parties have uniformly assumed to be a shortened form for "Yolanda." Before the grand jury, however, she spelled her name "Viola."

were turned over by the government to Intersimone's lawyers with the permission of the district judge, and they now appear unsealed as a part of Moten's Appendix.

Upon being informed of these incidents, the district judge examined Viola Intersimone *in camera*. She confirmed what he had already been told. It is unclear from the record whether Doe or Beller was present. Judge Owen next questioned Keno under oath. This was also done *in camera*, but the record shows that Doe, Beller and Viola Intersimone were present. The court discharged Keno and replaced him with an alternate, a decision which this Court has twice before held to be fully justified. *Doe, supra,* 551 F.2d at 901; *Moten, supra,* 564 F.2d at 629. Although the minutes of the *in camera* examinations of Keno and Viola Intersimone have been ordered sealed, portions of them have been quoted in the press. N.Y. Post, Feb. 4, 1977, at 8. They are before this Court for consideration on appeal.

After Keno was discharged, the district judge returned to the courtroom and made the following statement to all defense counsel out of the presence of the jury:

> The Court: Now, at the beginning of the morning it was brought to my attention that there was a possible attempt by a juror to approach a defendant in this case to get a message to that defendant. I have held a brief hearing on that subject and have confirmed that it is entirely possible that that may have occurred, although I make no finding to that effect.
>
> I have excused that juror. It is Juror No. 10. It was also brought to my attention, rather, information was brought to my attention that one defendant in this case spoke to another defendant in this case about the possibility of reaching a juror. Now, in that premise I propose to inquire on [sic] each of the remaining jurors, regular and alternate, separately in my robing room without counsel, to ascertain—I will do this on the record—to ascertain whether any information is forthcoming that would be suggested by this information that I have received.
>
> I have in mind to ask each juror or alternate roughly as follows, to tell each juror that I had instructed the jury generally at the beginning of the trial they were to speak to no one about the case. They were not to discuss the case amongst themselves or with anybody else. And with that as a prelude to ask two questions.
>
> One, whether anyone has spoken to that particular juror or try [sic] to speak with that particular juror about the case in any way at all.
>
> Two, whether the jury has in fact spoken amonst [sic] itself in any way as to the merits of the case that is before it.
>
> Now, I invite suggestions from counsel before me as to whether they disapprove of the procedure I have in mind or of the two questions I propose to ask, keeping in mind I obviously have a duty to ask something, given what has come to my attention, but I do not wish to go so far in the asking of the questions as to make an affirmative suggestion to any juror that anything has been afoot from defendants or counsel or anyone else, but that's the inference they might well draw if one gets too deep.

The district judge explained that he had taken the testimony of Keno and had interviewed a relative of one of the defendants. The defendant was not identified by the judge. Counsel were also told that the judge had asked Keno whether he had discussed these matters with any other juror and had been told by Keno that he had not.

The responses of counsel were varied. Some agreed with the district judge's proposal. Others objected to the use of any *in camera* proceedings and suggested that the voir dire should be done individually but with all counsel present. Some proposed that the voir dire be conducted *en masse*. Others thought there should be no voir dire at all. One lawyer sought a dismissal of the indictment with prejudice on the ground that a juror had been excused without his participation.

During the afternoon of September 20, 1976, the district judge conducted an *in*

*camera* voir dire of each juror in the manner he had proposed, except that at the suggestion of one lawyer he reversed the order of the two questions. The judge read the minutes of the voir dire to defense counsel, and there were no objections or suggestions for further questioning. The minutes reflect only three remarks that are worthy of mention here. Juror number 2, when asked whether the jurors had been discussing the merits among themselves, responded, "No. We have been talking about something else." Juror number 7, when asked whether anyone had spoken to her or attempted to speak to her replied, "No, not really, not nobody around the court, you know, not really." The district judge then asked, "And when you say 'not really', I take it by that you mean nobody has spoken to you?" She answered, "No, no." Juror number 8, when asked whether anyone had tried to talk to him about the case, said, "No, sir, not to me."

Also on September 20, 1976, the government commenced a separate investigation into possible jury tampering. The minutes of the grand jury testimony taken that afternoon have not been made public, and a criminal complaint upon which Keno was arrested in connection with this matter remains under seal. Both are before this Court for consideration of this appeal. Doe was eventually subpoenaed to testify before the grand jury on January 19, 1977, but he refused to testify, on grounds of attorney-client privilege, about what Intersimone told him about the conversation with Brightman. Judge Pierce rejected Doe's claim of privilege and held him in contempt. This Court affirmed that decision on March 17, 1977. *Doe, supra.* Doe testified before the grand jury on March 22, 1977. The minutes of his testimony are also before this Court, as is a copy of an affidavit submitted *in camera* in connection with the Doe matter by John P. Flannery, II, the Assistant United States Attorney in charge of the grand jury investigation.

Moten's trial concluded on November 16, 1976, when the jury returned verdicts of guilty against 17 defendants. Moten was convicted of conspiracy and 2 substantive offenses. The jury failed to reach a verdict as to him with respect to the other charges, and they were subsequently dismissed on the government's motion. Moten was sentenced on January 21, 1977, to an aggregate of 25 years imprisonment, followed by 6 years special parole, and a $50,000 fine. His conviction, along with those of 12 codefendants who appealed, was affirmed by this Court on September 6, 1977. *Moten, supra.* Moten is now serving his sentence.

While his appeal was pending before this Court, Moten filed a motion in district court "pursuant to *Brady v. Maryland,* 373 U.S. 83 [83 S.Ct. 1194, 10 L.Ed.2d 215] (1963) and Rule 33, Federal Rules of Criminal Procedure." He sought (1) any information in the government's possession that tended to show that Keno acted with another juror, (2) any information showing that Keno discussed with any of the jurors his efforts to contact any of the defendants, (3) any information showing that any juror learned, prior to the verdict, that (a) Keno had been arrested, (b) Keno tried to contact a defendant, or (c) anyone tried to contact Keno, (4) the unsealing of the district judge's *in camera* examinations of Keno and Viola Intersimone, (5) discovery of the complaint and other court documents filed in connection with the prosecution of Keno, and (6) permission to interview jurors.

At the time of Intersimone's sentencing on January 31, 1977, the district judge considered a motion by Intersimone similar to Moten's. He denied discovery of sealed materials in order to protect the ongoing grand jury investigation of the Keno matter. The judge also denied a request for the names and addresses of jurors and alternates, which were sought for the purpose of investigating whether any member of the jury other than Keno was tainted. The judge denied this latter discovery on the grounds that (A) there was no evidence that any other juror had been tainted, (B) the voir dire he had conducted during trial was an adequate investigation of the jurors, and (C) further questioning of the jurors would amount to harassment. All defendants were expressly prohibited from talking to

any jurors without prior court authorization.

On March 24, 1977, the district judge heard argument in connection with Moten's motion. Of the documents Moten submitted to the court, only two merit comment here. The first is an affidavit from Doe which contained the following statement:

I had informed the prosecutor Daniel Beller that, according to Ms. Intersimone, juror number 10 was not alone at the time he spoke to her. As I understood it, he had been speaking with another juror, left that juror to talk to Ms. Intersimone, and then rejoined that other juror and both left the area together. Mr. Beller was quite anxious to determine the identity of the other juror for obvious reasons, and I inquired of Ms. Intersimone on his behalf. Ms. Intersimone felt she could not say positively which juror had been with Keno, but she believed that it was one of the Hispanic jurors, either number 2 or number 8. When pressed by me, Ms. Intersimone finally decided she was unable to positively identify the person who had been with Keno and rather than identify the wrong person, she said she could not identify the other person. I reported this to Mr. Beller by telephone and there the matter was dropped.

The second is an affidavit from Isabelle Blau, the forewoman of the jury, in which she stated that jurors 2 and 8 and Keno often had lunch together and that they enjoyed a "rapport." Also before the court at that time was a new motion by Intersimone to interview jurors. Intersimone had recently fired his lawyer, so he appeared *pro se.*

During the course of the proceedings on March 24th, the government denied the existence of any information of the kind sought by Moten in items (1), (2) and (3) above. These matters are no longer involved in the case. The district judge denied in open court the request for the unsealing of the *in camera* examination of Keno and Viola Intersimone on the grounds that nothing in the materials would be useful to Moten and keeping them sealed was necessary to protect an ongoing investigation.

On July 5, 1977, the district judge filed a Memorandum and Order denying the remaining motions for discovery and, implicitly Moten's Rule 33 motion for a new trial. The reason for denying discovery of sealed materials relating to the Keno prosecution was that they contained nothing the judge thought would be helpful to Moten. The reasons for denying permission to interview jurors were that: (I) the judge was of the view that Moten's evidentiary showing was inadequate, (II) the judge said the defendants had, in effect, waived the right to have him conduct a more thorough interview than that which was conducted at trial by failing to request such an interview during trial, (III) the judge apparently believed that a post-trial interview of jurors by counsel would be improper, for he cited *United States v. Brasco,* 516 F.2d 816, 819 n.4 (2d Cir.), *cert. denied,* 423 U.S. 860, 96 S.Ct. 116, 46 L.Ed.2d 88 (1975), in which this Court criticized a "planned, systematic, broad-scale, posttrial inquisition of the jurors by a private investigator . . . ."

## DISCUSSION

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a . . . trial, by an impartial jury . . . ." In *Remmer v. United States,* 347 U.S. 227, 229, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954) [*Remmer I*], the Supreme Court said,

In a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties. The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant.

*See also Mattox v. United States*, 146 U.S. 140, 149–50, 13 S.Ct. 50, 36 L.Ed. 917 (1892). In *Miller v. United States*, 403 F.2d 77, 84 n.11 (2d Cir. 1968), this Court stated, in language that is directly applicable to this case, that

> Where, as here, the incident was explored before submission to the jury, the trial judge's initial appraisal of the ability of the jurors to render a fair verdict in light of the objective facts should stand unless it is manifestly unreasonable, as the Court thought in *Remmer*, or significant new objective facts are developed.

■ The prior decisions of this Court in *Doe* and *Moten* establish conclusively that Judge Owen's "initial appraisal" was not "manifestly unreasonable." Therefore, Moten would be entitled to a new trial only if he can make a showing of "significant new objective facts" which strongly tend to prove that the Keno affair tainted one or more of the other jurors. It is clear that Moten has made no such showing to date, and he does not argue that he has. Instead, he argues that he has a right to learn "old facts" that have been denied him so that he can determine how, or whether, to go about developing the new facts necessary to warrant a new trial.

Moten seeks discovery in three different areas. First, he seeks disclosure of the *in camera* examinations of Keno and Viola Intersimone. Second, he seeks disclosure of grand jury materials relating to the government's investigation of the Keno affair. Third, he seeks permission to interview jurors. The objective of each of these is the same—to discover whether any juror other than Keno was tainted—but the issues raised by each are different.

■ Before discussing the three types of discovery sought by Moten, it is important to clarify the object of the instant proceedings. Although this is an appeal from the denial of Moten's Rule 33 motion, the real relief denied was access to materials that concern the Keno affair and which are arguably necessary in order to determine whether any grounds exist for a motion for a new trial. There is no doubt that reason-able grounds exist to undertake such an investigation. The district judge conducted a limited investigation during the trial, and the government itself has conducted an investigation before the grand jury. It is clear that a very serious irregularity occurred during the trial of this case, and under the circumstances "the entire picture should be explored." *Remmer v. United States*, 350 U.S. 377, 379, 76 S.Ct. 425, 426, 100 L.Ed. 435 (1956) [*Remmer II*]; *see* Wright, Federal Practice & Procedure: Criminal § 554, at 491–92 (1969); *cf. United States v. Persico*, 339 F.Supp. 1077, 1083–84 (E.D.N.Y.), *aff'd*, 467 F.2d 485 (2d Cir. 1972), *cert. denied*, 410 U.S. 946, 93 S.Ct. 1360, 35 L.Ed.2d 613 (1973). This exploration should be done not merely to the government's satisfaction, or to the satisfaction of the district judge, but also to the satisfaction of the defendant. It is true that the defendant should not be permitted to trample on other important interests such as the secrecy of grand jury proceedings or the right of petit jurors to be free from harassment, but it is also true that a defendant has a constitutional right to a trial by an impartial jury. Although, so far as appears from the facts developed to date, Moten received such a trial, the entire Keno affair has yet to be explored. Many questions remain unanswered, and there is no reason to limit Moten's investigation of that affair unless it is necessary to protect some other interest. After all, "[s]unlight is said to be the best of disinfectants." L. Brandeis, Other People's Money 62 (1933).

## I. THE KENO AND VIOLA INTERSIMONE EXAMINATION

Whenever something occurs at a trial that may tend to affect the impartiality of one or more members of the jury, both sides have a vital interest in learning everything there is to know about the matter. The interest of the accused is grounded upon the Sixth Amendment right to an impartial jury. The interest of the government is based not only on its concern with having an impartial jury, but also on its responsibility to investigate possible jury tamper-

ing. 18 U.S.C. § 1503. Both sides also have an interest in isolating and replacing any juror who may be affected, so that the trial can continue without the need for a mistrial. Although the interests of the parties may be consistent in principle, they may not necessarily be so in fact. The accused, for example, will probably be a prime suspect in the government's jury tampering investigation. Therefore, the government will not want the accused to be privy to what it learns in the course of its investigation. The interest of learning the whole truth may conflict with the interest of continuing the trial. Obviously, if the members of the jury are questioned in depth about a possible jury tampering incident, they may become so prejudiced that the accused cannot obtain a fair trial.

■■■ The initial burden of reconciling these competing interests rests upon the trial judge, and this burden will be particularly heavy where, as here, many defendants are involved and their individual interests are in conflict. In the instant case, the district judge weighed them and concluded that the public interest in preventing a mistrial and the government's interest in pursuing its investigation required that the examinations of Keno and Viola Intersimone be conducted *in camera*. This Court has recently said that there is a presumption against the use of *in camera* proceedings and that "[t]hey can only be justified and allowed by compelling state interests." *In Re Grand Jury Subpoena Directing Taylor to Appear and Testify*, 567 F.2d 1183, 1188 (2d Cir. 1977). We are satisfied that the *Taylor* standard was met, and that the district judge's balancing of the competing interests was correct.[3]

However, the interest of the accused in learning the whole story does not end with the trial, *see, e. g., Parker v. Gladden*, 385 U.S. 363, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966) (improper influence on jury discovered two years after jury verdict), and the government's interest in its ongoing investigation

does not ongo forever. The defendant's interest in learning the whole truth has at all times been equal to that of the government, *see* Fed.R.Crim.P. 43(a); his access to materials that the government has had from the outset has merely been delayed because of the more immediate needs of the government. There comes a time when the government's interest in keeping the examination secret can no longer be said to be sufficiently "compelling" to outweigh the defendant's interest in knowing what happened at his trial and to displace the presumption against *in camera* proceedings.

The district judge's decision to deny Moten discovery was based in part on the apparent assumption that if the *in camera* examinations were proper during the trial, then it is proper to seal the *in camera* proceedings indefinitely. This is not so. When *in camera* proceedings have been justified by the need to protect an ongoing investigation, the secrecy may be maintained only so long as is necessary to protect the investigation. As long as the proceedings remain sealed, the government bears a continuing burden of justifying the need for secrecy. There is nothing in the record that would support the conclusion that the government is presently able to sustain this burden, for there is nothing in the record to indicate the present status of the Keno investigation. Indeed, we think there has been quite enough time for any "ongoing" investigation to be completed.

■ The district judge's decision was also based in part on his apparent belief that the burden was on the defendant to come forward with proof that the *in camera* materials would help prove the complicity of another juror. This is not the test. The interest of the defendant in obtaining disclosure is adequately established when it appears that (1) the *in camera* proceedings occurred during his trial and (2) the information contained in the materials is relevant to a legitimate object of his inquiry. Here, the *in camera* proceedings occurred at

---

**3.** In *Moten, supra*, 564 F.2d at 629, we rejected the argument that it was reversible error to excuse Keno without the participation of counsel. To that extent, the propriety of the use of *in camera* procedures is now law of the case.

Moten's trial; the object of his inquiry—to learn the full extent to which the jury that convicted him was affected by the Keno affair—is a legitimate one; and there is no doubt that the statements of Keno and Viola Intersimone are relevant to that inquiry. It is immaterial that the district judge, after an *in camera* examination of the *in camera* materials, agrees with the government that they contain no facts that would help the defendant. The Supreme Court has repeatedly disapproved of judicial speculation about whether *in camera* materials would be useful to the defense. *Compare Alderman v. United States*, 394 U.S. 165, 182, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969) (records of illegal wiretaps), *Dennis v. United States*, 384 U.S. 855, 873–75, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966) (grand jury testimony of trial witnesses), *and Jencks v. United States*, 353 U.S. 657, 669, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957) (F.B.I. reports submitted by trial witnesses), *with Rosenberg v. United States*, 360 U.S. 367, 371, 79 S.Ct. 1231, 3 L.Ed.2d 1304 (1959) (5 to 4 decision; non-disclosure of documents containing information already in possession of defense held to be harmless error). If the materials are relevant, the district judge's estimation of their lack of helpfulness does not justify withholding them from the defense.

## II. GRAND JURY MATERIALS

■ The issues raised by Moten's request for discovery of grand jury materials are different from those raised by his request for the *in camera* examinations. There is a presumption against *in camera* proceedings, and the burden is on the government to justify the need for secrecy. The situation is reversed with respect to grand jury materials. Grand jury proceedings are traditionally conducted in secret. *See* Fed.R.Crim.P. 6(e). The secrecy is not absolute. It may be breached "in connection with a judicial proceeding," *id.*, such as Moten's proceeding to obtain a new trial. However, the burden is on the party seeking disclosure to show a "particularized need" that outweighs the need for secrecy. *Dennis v. United States*, 384 U.S. 855, 868, 86 S.Ct. 1840, 16 L.Ed.2d

973 (1966); *Pittsburgh Plate Glass Co. v. United States*, 360 U.S. 395, 400, 79 S.Ct. 1237, 3 L.Ed.2d 1323 (1959); *United States v. Procter & Gamble Co.*, 356 U.S. 677, 683, 78 S.Ct. 983, 2 L.Ed.2d 1077 (1958). *See also United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 234, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); *In re Biaggi*, 478 F.2d 489, 491–92 (2d Cir. 1973); *Atlantic City Electric Co. v. A. B. Chance Co.*, 313 F.2d 431, 434 (2d Cir. 1963). Although this standard has been eroded to some extent, *see Baker v. United States Steel Corp.*, 492 F.2d 1074 (2d Cir. 1974); *United States v. Youngblood*, 379 F.2d 365, 369 (2d Cir. 1967) (grand jury testimony of adverse trial witness, on same subject as trial testimony, should · be disclosed without a showing of particularized need); Wright, Federal Practice & Procedure: Criminal § 106, at 172–74 (1969), we find no need to reexamine it here.

■ The record as presently developed is inadequate to determine whether Moten is entitled to disclosure of grand jury materials. The most important unanswered question is whether the grand jury investigation remains active. While a grand jury investigation is active, there are a variety of reasons for secrecy:

(1) To prevent the escape of those whose indictment may be contemplated; (2) to insure the utmost freedom to the grand jury in its deliberations, and to prevent persons subject to indictment or their friends from importuning the grand jurors; (3) to prevent subornation of perjury or tampering with the witnesses who may testify before the grand jury and later appear at the trial of those indicted by it; (4) to encourage free and untrammeled disclosures by persons who have information with respect to the commission of crimes; (5) to protect the innocent accused who is exonerated from disclosure of the fact that he has been under investigation, and from the expense of standing trial where there was no probability of guilt.

*United States v. Amazon Industrial Chemical Corp.*, 55 F.2d 254, 261 (D.Md.1931), *quoted in United States v. Procter & Gam-*

*ble Co., supra*, 356 U.S. at 681–82 n.6, 78 S.Ct. 983, 986, *quoting United States v. Rose*, 215 F.2d 617, 628–29 (3d Cir. 1954). These reasons are so strong that if the grand jury investigation of the Keno affair is still active Moten may not obtain disclosure. *See In re Bonanno*, 344 F.2d 830, 834 (2d Cir. 1965). On the record before us, however, it is not possible to make the necessary determination. The investigation may be over or it may be pursuing Moten as a major suspect. If the latter is true, then Moten is certainly not entitled to progress reports. If the former is true, then most of the policies underlying the need for secrecy are no longer present. Generally, the only reason that survives the conclusion of an investigation is the encouragement of disclosures by those with knowledge of crime. *See* Wright, Federal Practice & Procedure: Criminal § 106, at 170–74 (1969). This interest is an important one, and no case in this Circuit has ever held that the secrecy of the grand jury must be breached, even when this is the only interest being protected, unless a showing of particularized need has been made, except in the case of a grand jury witness who is to testify at trial. See *United States v. Youngblood, supra*, 379 F.2d at 370, where the Court also recognized that the particularized need standard does not limit the discretion of the district courts to order disclosure when a lesser showing has been made. If a showing of particularized need has been made, disclosure should occur unless the grand jury investigation remains sufficiently active that disclosure of materials would prejudice a legitimate interest of the government, a fact which must be determined on remand. *See United States v. Socony-Vacuum Oil Co., supra*, 310 U.S. at 234, 60 S.Ct. at 849 ("after the grand jury's functions are ended, disclosure is wholly proper where the ends of justice require it."). This reflects "the growing realization that disclosure, rather than suppression, of relevant materials ordinarily promotes the proper administration of criminal justice." *Dennis v. United States, supra*, 384 U.S. at 870, 86 S.Ct. at 1849. Thus, a remand is necessary to determine whether the grand jury investigation remains active.

An additional question that has yet to be explored relates to Moten's showing of particularized need. His showing is sufficiently particularized in the sense that he has focused on a specific area of inquiry and he is able to specify materials that are arguably relevant to that inquiry. His focus is on the question whether any juror other than Keno was tainted. The specific materials he seeks are the minutes of the testimony of Keno, Viola Intersimone and Doe regarding the Keno affair, the affidavit of Assistant United States Attorney Flannery, and the Keno complaint. Whether he has sufficient "need" of these materials is a more difficult question. The Supreme Court has invoked the concept of "need" in other contexts which, like this one, deal with a privilege against disclosure. *E. g., Hickman v. Taylor*, 329 U.S. 495, 509, 67 S.Ct. 385, 91 L.Ed. 451 (1947) (attorney work product); *Branzburg v. Hayes*, 408 U.S. 665, 710, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972) (Powell, J., concurring) (confidential news source). *See also NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 n.16, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975). Exactly what is meant by the requirement of a showing of "need" or "necessity" is unclear. Presumably, it refers to the ability of the party seeking disclosure to obtain the information he seeks from sources other than the protected source. Thus, it would seem that a party's need varies in proportion to the degree of access he has to other sources of the information he seeks. However, the determination of "need" should not be one which imposes unreasonable burdens on the courts, *see State of Illinois v. Sarbaugh*, 552 F.2d 768, 777 (7th Cir. 1977), or which requires them to perform tasks for which they are ill-suited, *see Dennis v. United States, supra*, 384 U.S. at 875, 86 S.Ct. at 1851 ("In our adversary system, it is enough for judges to judge. The determination of what may be useful to the defense can properly and effectively be made only by an advocate." (footnote omitted)).

Bearing these considerations in mind, we think that Moten has shown a sufficient

need for the grand jury testimony of Keno and Viola Intersimone. Inasmuch as these were the individuals immediately involved in the affair, an exploration of the entire picture requires access to their versions of the facts. It might be argued that the grand jury minutes should be disclosed only to the extent necessary to reveal information that Moten is unable to learn from inspecting the *in camera* examinations or from personal interviews with Keno and Viola Intersimone. However, this approach would unnecessarily burden the courts with the task of scouring the grand jury minutes *in camera* for details that were not otherwise disclosed. In short, if the grand jury investigation is no longer active, we think Moten's showing of need is sufficient at least to override the generalized need for grand jury secrecy and to shift the burden to the government to specify which portions of the grand jury minutes, if any, must remain secret in order to protect a legitimate interest of the government. On the other hand, Moten's showing is not sufficient to justify disclosure of the grand jury testimony of Doe or the affidavit of Assistant United States Attorney Flannery. The only relevant information contained in Doe's grand jury testimony consists of a second-hand account of Viola Intersimone's version of the Keno affair. The only relevant information contained in the Flannery affidavit is a third-hand account of the same thing. Because Moten will have access to Viola Intersimone's first-hand version, and because Moten has possession of an affidavit from Doe which contains his second-hand version, it cannot be said that Moten needs access to Doe's testimony or Flannery's affidavit. The only remaining matter relating to the grand jury investigation of Keno to be considered is the sealed complaint on which Keno has been arrested. We are at a loss to understand why this has been kept secret. Nevertheless, because it contains no information that would not be disclosed by an inspection of the *in camera* examinations or grand jury testimony of Keno and Viola Intersimone, it may remain under seal.

## III. INTERVIEW OF JURORS

 Moten's application for permission to conduct a post-trial interview of jurors requires the court to balance several important but conflicting interests. On the one hand, the proper functioning of the jury system requires that the courts protect jurors from being "harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict." *McDonald v. Pless*, 238 U.S. 264, 267, 35 S.Ct. 783, 784, 59 L.Ed. 1300 (1915); *see United States v. Crosby*, 294 F.2d 928, 950 (2d Cir. 1961), *cert. denied*, 368 U.S. 984, 82 S.Ct. 599, 7 L.Ed.2d 523 (1962). In addition, certain limits on post-trial inquiry into jury verdicts are necessary in the interest of finality lest judges "become Penelopes, forever engaged in unravelling the webs they wove." *Jorgensen v. York Ice Machinery Corp.*, 160 F.2d 432, 435 (2d Cir.), *cert. denied*, 332 U.S. 764, 68 S.Ct. 69, 92 L.Ed. 349 (1947). On the other hand, the defendant has a right to a trial by an impartial jury, unprejudiced by extraneous influence, *Remmer I, supra*, and when reasonable grounds exist to believe that the jury may have been exposed to such an influence, "the entire picture should be explored," *Remmer II, supra*, 350 U.S. at 379, 76 S.Ct. at 426. Often, the only way this exploration can be accomplished is by asking the jury about it. *See, e. g., United States v. Winters*, 434 F.Supp. 1181 (N.D.Ind.1977).

 The Federal Rules of Evidence attempt to reconcile these conflicting interests. Rule 606(b) bars jurors from testifying "as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions . . . ." The Advisory Committee Note explains that this exclusionary rule is designed to promote "freedom of deliberation, stability and finality of verdicts, and protection of jurors against annoyance and embarrassment." The exclusionary rule is not absolute, however, but yields to the need for juror testimony in situations where there is a reduced potential for harassment

or embarrassment of jurors, such as when evidence concerning objective facts is sought. Thus, the rule admits testimony concerning "whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror." *See Mattox v. United States*, 146 U.S. 140, 148–49, 13 S.Ct. 50, 52–53, 36 L.Ed. 917 (1892). *See generally United States v. Hockridge*, 573 F.2d 752 (2d Cir. 1978).

█ The rules relating to post-trial interviewing of jurors are less well-developed than the rules relating to the admission of juror testimony in order to impeach a verdict. Nevertheless, many of the same interests are implicated in both situations, and so the same sort of balancing is appropriate to both. An additional factor which must be considered here is one which is seldom a matter of concern in the formulation of evidentiary rules. Human nature is such that some jurors, instead of feeling harassed by post-trial interviewing, might rather enjoy it, particularly when it involves the disclosure of secrets or provides an opportunity to express misgivings and lingering doubts. A serious danger exists that, in the absence of supervision by the court, some jurors, especially those who were unenthusiastic about the verdict or have grievances against fellow jurors, would be led into imagining sinister happenings which simply did not occur or into saying things which, although inadmissible, would be included in motion papers and would serve only to decrease public confidence in verdicts. Thus, supervision is desirable not only to protect jurors from harassment but also to insure that the inquiry does not range beyond subjects on which a juror would be permitted to testify under Rule 606(b).

It is well established in this Circuit that in order to insure that jurors are protected from harassment, a district judge has the power, and sometimes the duty, to order that all post-trial investigation of jurors shall be under his supervision. *Miller v. United States*, 403 F.2d 77, 81–82 (2d Cir.

1968). "Whether all investigations of jurors need be under judicial control from the onset is debatable. The American Bar Association's Code of Professional Responsibility permits investigations without court supervision but suggests that they be conducted 'with circumspection and restraint.'" 3 Weinstein's Evidence ¶ 606[03], at 606–27 (1976), *citing* EC 7–30 (1969). The ABA's Standards Relating to the Administration of Criminal Justice suggest notice to opposing counsel and the court:

> After verdict, the lawyer should not make comments concerning an adverse verdict or ask questions of a juror for the purpose of harassing or embarrassing the jury in any way which will tend to influence judgment in future jury service. If the lawyer has reasonable ground to believe that the verdict may be subject to legal challenge, he may properly, if no statute or rule prohibits such course, communicate with jurors for that limited purpose, upon notice to opposing counsel and the court.

The Defense Function § 7.3(c) (1971). Although this Court has declined the invitation "to formulate guidelines to govern the entire subject of post-verdict interrogation of jurors," *Miller, supra*, 403 F.2d at 81, we have commented in dictum that

> complicity by counsel in a planned, systematic, broadscale, posttrial inquisition of the jurors by a private investigator or investigators is reprehensible, to say the least. . . . [W]here a full dress inquiry of this sort was intended to be launched, ". . . post-trial questioning of jurors must only be conducted under the strict supervision and control of the court, with inquiry restricted to those matters found by the court as both relevant and proper."

*United States v. Brasco*, 516 F.2d 816, 819 n.4 (2d Cir.), *cert. denied*, 423 U.S. 860, 96 S.Ct. 116, 46 L.Ed.2d 88 (1975), *quoting*, 385 F.Supp. 966, 970 n.5 (S.D.N.Y.1974). On the facts of this case it is unnecessary for us to join the debate over the extent to which post-verdict interviewing of jurors must be subject to judicial control. At a minimum,

however, we think notice to opposing counsel and the court should be given in all cases. Moreover, it always lies within the province of the district judge to take full control of the matter when it is first brought to his attention, and it was certainly proper for the district judge to have done so here.

■ In exercising the power to protect the jury, the district judge must bear in mind that he is supervising an investigation. The object of the proceeding is to permit the truth to be discovered with the least possible harm to other interests. When there has been a showing warranting an investigation, barring all interviewing, even under supervision of the court, is improper. We note that even in *Miller* further inquiry was not foreclosed. 403 F.2d at 84. In some cases, a complete bar may be appropriate. An example given in Professor Moore's Treatise is "a publicized case which ends in a hung jury and is likely to be retried." In such a case, "the trial judge should instruct jurors not to disclose the deliberation, lest it jeopardize the fairness of the second trial." 8A Moore's Federal Practice—Criminal Rules ¶ 31.08[1] [b], at 31–58 n.13 (2d ed. 1977). Another example is our own *United States v. Dioguardi,* 492 F.2d 70 (2d Cir.), *cert. denied,* 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 112 (1974). There we refused to order a district judge to inquire into the mental competence of a juror. We explained that "only strong evidence that it is likely that the juror suffered from such incompetence during jury service will justify an inquiry into whether such incompetence in fact did exist." 492 F.2d at 78. As the opinion explains at length, this strict standard is necessary in order to protect jurors from the substantial potential danger of harassment inherent in permitting such an inquiry on a lesser showing.

Although the instant case is an unusual one, it is not unusual in a way that would suggest barring inquiry of the jurors. On the contrary, it is unusual because a series of events occurred at trial that support a reasonable suspicion that the jury may have been corrupted. An inquiry is certainly warranted. Thus, while the district judge

was correct at the time of Intersimone's sentencing in taking control of the investigation insofar as it will require the questioning of jurors, he erred in denying completely Moten's motion for permission to conduct some form of inquiry. There is ample support for the propriety of a hearing in cases like this one. *See United States v. Camporeale,* 515 F.2d 184, 188 (2d Cir. 1975); *United States v. Howard,* 506 F.2d 865, 869 (5th Cir. 1975); *Paz v. United States,* 462 F.2d 740, 745–46 (5th Cir. 1972), *after remand,* 473 F.2d 662, *cert. denied,* 414 U.S. 820, 94 S.Ct. 47, 38 L.Ed.2d 52 (1973); *United States ex rel. Owen v. McMann,* 435 F.2d 813, 815 (2d Cir. 1970), *cert. denied,* 402 U.S. 906, 91 S.Ct. 1373, 28 L.Ed.2d 646 (1971); *Ryan v. United States,* 89 U.S.App. D.C. 328, 330, 191 F.2d 779, 781 (1951), *cert. denied,* 342 U.S. 928, 72 S.Ct. 368, 96 L.Ed. 691 (1952); *United States v. Winters,* 434 F.Supp. 1181, 1183 (N.D.Ind.1977); *United States v. Brasco, supra,* 385 F.Supp. at 969– 70 n.5; *United States v. Rocks,* 339 F.Supp. 249, 253–55 (E.D.Va.1972); *Radel v. Smith,* 265 F.Supp. 585, 586 (D.Conn.1967); *cf. United States v. Persico,* 339 F.Supp. 1077, 1083–84 (E.D.N.Y.), *aff'd,* 467 F.2d 485 (2d Cir. 1972), *cert. denied,* 410 U.S. 946, 93 S.Ct. 1360, 35 L.Ed.2d 613 (1973).

We are aware of many other decisions that have rejected motions for post-trial interviews of jurors. *King v. United States,* 576 F.2d 432, 438 (2d Cir. 1978) ("frail and ambiguous showing"); *United States v. Eagle,* 539 F.2d 1166, 1170–71 (8th Cir. 1976), *cert. denied,* 429 U.S. 1110, 97 S.Ct. 1146, 51 L.Ed.2d 563 (1977) (no specific allegations of improper acts); *United States v. Franks,* 511 F.2d 25, 37–38 (6th Cir.), *cert. denied,* 422 U.S. 1042, 95 S.Ct. 2654, 45 L.Ed.2d 693 (1975) (deferring to trial court discretion); *United States v. Dye,* 508 F.2d 1226, 1232 (6th Cir. 1974), *cert. denied,* 420 U.S. 974, 95 S.Ct. 1395, 43 L.Ed.2d 653 (1975) (no motion made; limited voir dire conducted); *Smith v. Cupp,* 457 F.2d 1098, 1100 (9th Cir.), *cert. denied,* 409 U.S. 880, 93 S.Ct. 208, 34 L.Ed.2d 135 (1972) (no specific claim of misconduct); *United States v. Allied Stevedoring Corp.,* 258 F.2d 104, 105–06 (2d Cir.), *cert. denied,* 358 U.S.

841, 79 S.Ct. 58, 3 L.Ed.2d 76 (1958) (no "adequate grounds" shown where movants merely speculated that basis for differing treatment of codefendants might have been improper); *United States v. Hall,* 424 F.Supp. 508, 538–40 (W.D.Okl.1975), *aff'd,* 536 F.2d 313 (10th Cir.), *cert. denied,* 429 U.S. 919, 97 S.Ct. 313, 50 L.Ed.2d 285 (1976) (no specific allegation of impropriety); *Capella v. Baumgartner,* 59 F.R.D. 312, 315 (S.D.Fla.1973) (basis for request was speculation that impropriety might have occurred). *See generally United States v. McKinney,* 429 F.2d 1019 (5th Cir.), *rev'd on rehearing,* 434 F.2d 831 (1970), *cert. denied,* 401 U.S. 922, 91 S.Ct. 910, 27 L.Ed.2d 825 (1971); *United States v. Driscoll,* 276 F.Supp. 333 (S.D.N.Y.1967) (discussing ethical considerations). Each of these cases merely stands for the unexceptional proposition that a convicted defendant should not be allowed to waste the time of a district judge or inconvenience jurors merely to conduct a fishing expedition. None is inconsistent with our view that where reasonable grounds for investigation exist, the matter should be explored.

 The government argues, and the district judge appears to have agreed, that the failure of the defendants to ask for a more intensive voir dire of jurors during the trial operated as a waiver of the right to seek a new investigation now. This argument is based on language found in *United States v. Gersh,* 328 F.2d 460, 463 (2d Cir.), *cert. denied,* 377 U.S. 992, 84 S.Ct. 1919, 12 L.Ed.2d 1045 (1964), in which we warned that there would be a waiver if counsel had known of a prejudicial outside influence before the jury finished deliberating, "but had nevertheless stood mute, gambling on an acquittal while holding this issue in reserve." *Gersh* is inapplicable here because at the time the government suggests that counsel should have sought further inquiry, counsel had been denied access to the *in camera* examinations. If counsel had known, for example, that Viola Intersimone had told the court that Keno

had been talking to someone immediately before he approached her, they may well have sought further inquiry. In the circumstances, it cannot be said that there was a knowing and intelligent waiver. *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). *Compare United States v. Bufalino,* 576 F.2d 446, 451 (2d Cir. 1978), where none of the facts were kept from counsel.

REMAND

This case must be remanded for limited proceedings with respect to each of the three types of discovery sought. The *in camera* examinations must bc disclosed unless the government can show a need for more time for a prompt completion of an ongoing investigation. If this can be shown, the district judge may delay disclosure for a reasonable time. The judge should bear in mind that only a compelling interest can justify nondisclosure and the government has had ample time to conclude its investigation. Moten's application for disclosure of grand jury materials must be reevaluated in light of the considerations discussed in this opinion. Although Moten has not made a sufficient showing to warrant disclosure of some materials, his showing with respect to the testimony of Keno and Intersimone is sufficient, in the absence of some further showing by the government, to justify disclosure if the grand jury investigation has been concluded or if it lies dormant, subject to being reopened only if new facts should turn up. Finally, an inquiry of the jurors must be permitted. We leave to the district judge's sound discretion whether he should conduct the questioning personally or whether it should be done by someone else. The scope of the questioning should be appropriately defined, but it should be adequate to permit the entire picture to be explored. Also, it may be advisable to make all of Moten's co-defendants parties to this matter so that the investigation can be concluded quickly and efficiently in a single proceeding.[4]

Reversed and remanded.

4. We have carefully considered Moten's contention regarding alleged prejudicial publicity and we find it to be without merit. The district judge adequately explored and disposed of this claim. The matter need not be explored further during the questioning of jurors unless the district judge chooses to allow it.

**668**

*On Petition of Appellee for Rehearing*

PER CURIAM:

The government has petitioned for a rehearing in this case. It argues that although our decision purports to apply the standards set in cases such as *Dioguardi* and *King* the showing in this case fails to satisfy those standards. The government also suggests a less drastic alternative to the inquiry of jurors we originally required. We are unpersuaded by the first argument, but there is merit to the second, and our directions for the remand will be modified, accordingly.

The basis for our conclusion that an inquiry of jurors is warranted rests almost entirely on two undisputed facts. First, one of the original trial jurors, Keno, engaged in improper conduct. It is unknown whether the idea to approach the defendants originated with him or whether, as the government asserts, "[t]he juror misconduct in this case was prompted solely by defendants' corrupt efforts to tamper with the jury." But it is clear that the corruption was present. Second, when Keno's corruption first came to light, at the time he approached Ms. Intersimone a few blocks from the courthouse after court recessed shortly after noon on Friday, September 17, he was not alone. Given the circumstances, it is entirely possible that the other person was a juror. If he was, the inference that he was involved is a powerful one. *Cf. United States v. Gainey*, 380 U.S. 63, 85 S.Ct. 754, 13 L.Ed.2d 658 (1965) (upholding statutory provisions authorizing inference of guilt of substantive offenses from unexplained presence at site of illegal activity). The issue, it must be remembered, is not whether the defendant is presently able to prove his case conclusively; rather, it is whether his showing is sufficiently strong to warrant an investigation to discover the truth. Considered in this light, it is our view that the undisputed facts justify further inquiry.

The government faults our original decision for its failure to explore alternatives less drastic than an inquiry of the jurors. No such alternatives were suggested when this case was briefed and argued. However, the alternative which the government has belatedly proposed has merit, and the district judge may follow a modified version if he wishes. We authorize the following. The inquiry may initially be limited to calling Keno, Ms. Intersimone and Doe. If Keno identifies his companion, then an inquiry of the jurors may become unnecessary. Similarly, if Ms. Intersimone says that her earlier statements about the presence of another individual were false, then the trial judge would have to decide whether Intersimone's prior statements to him, to the grand jury and to Doe, standing alone, justify further inquiry. If, as we expect, Keno denies that another person was present or refuses to testify, and if Intersimone adheres to her story that another person was present, then the limited inquiry of jurors that we originally required must be undertaken.

The petition for rehearing by the panel is denied.